2020 UT App 51

# THE UTAH COURT OF APPEALS

STEVEN J. ONYSKO,
Petitioner,

*v.*

DEPARTMENT OF ENVIRONMENTAL QUALITY AND
CAREER SERVICE REVIEW OFFICE,
Respondents.

Opinion
No. 20180984-CA
Filed March 26, 2020

Original Proceeding in this Court

Ryan B. Hancey and J. Adam Knorr,
Attorneys for Petitioner

Sean D. Reyes and Peggy E. Stone,
Attorneys for Respondent Department of
Environmental Quality

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DIANA HAGEN
concurred.

ORME, Judge:

¶1 The Department of Environmental Quality (DEQ) terminated Steven J. Onysko's nearly twenty-year employment, citing his unprofessional and abusive conduct toward coworkers, supervisors, and DEQ customers. Onysko appealed his termination to the Career Service Review Office (the CSRO). Following a seven-day evidentiary hearing before one of its hearing officers, the CSRO issued a decision (the CSRO Decision) affirming his termination. Onysko now seeks judicial review of the CSRO Decision, and we decline to disturb it.

## BACKGROUND[1]

¶2     Onysko worked as a level III environmental engineer with career service status in DEQ's Division of Drinking Water (DDW). During Onysko's long employment at DEQ, his technical abilities and expertise as an engineer had never been called into question.

### *DEQ's Termination of Onysko's Employment*

¶3     In 2006, DDW's director issued a written warning to Onysko (the 2006 Warning) regarding, among other things, Onysko's "rude, nasty, arrogant, and confrontational" behavior toward his work colleagues and DEQ customers. Nearly two years later, in 2008, another director issued a second written warning to Onysko (the 2008 Warning) regarding an incident with a coworker in which the director characterized Onysko's conduct as "clearly inappropriate and unprofessional." These warnings, however, did not prevent Onysko from receiving favorable work performance evaluations. Between 1998 and 2016, Onysko's annual evaluations rated his work performance as either "Successful" or "Exceptional."

¶4     In September 2016, Onysko's supervisor (Supervisor) completed a performance evaluation for the July 2015–June 2016 work period, giving Onysko a rating of Successful. In the evaluation, Supervisor commended Onysko for his expertise in

---

1. "Because the party seeking review of an agency's order following a formal administrative proceeding has the burden to prove that the agency's factual findings are not supported by substantial evidence," which Onysko has not done, "we state the facts and all legitimate inferences to be drawn from them in the light most favorable to the agency's findings." *Macfarlane v. Career Service Review Office*, 2019 UT App 133, n.1, 450 P.3d 87 (quotation simplified).

the field, stating, "Other DDW staff has commented that every troubled water system in Utah should go through a Steve Onysko sanitary survey." She also characterized him as "an excellent mentor to other engineers because of his knowledge, experience, and willingness to help." But Supervisor noted that "[t]here is room for improvement regarding . . . follow up and follow through . . . as some projects are not responded [to] within the expected time frame."

¶5 Onysko believed he at the very least deserved a rating of Very Successful and considered the Successful rating unfair. He also disagreed with Supervisor's room-for-improvement comment and said as much in the "Employee Comment" section of the evaluation form, calling it "unfair criticism." But Onysko did not stop at this. He continued:

> My inference is that DDW management more favorably performance-evaluates engineering staff who rubber-stamp public works engineering designs, and less favorably performance-evaluates engineering staff who do due diligence in review of public works engineering designs.
>
> . . . .
>
> DDW management should first be investigated to determine whether or not there is conscious, deliberate under-supervision of new staff, and other junior staff, to leave them intentionally ill-prepared to review public works project designs, and intentionally ill-prepared to protect the public against water project design errors.
>
> Secondly, DDW management should be investigated to determine whether or not management's reason for taking away certain review assignments from me is to "shop" the

assignments to other less-senior staff until DDW management can find a less discerning engineer with consequent briefer review time and more likely favorable review finding.

Thirdly, DDW management should be investigated to determine whether or not certain categories of review assignments for illegitimate reason are not given to me and other experienced engineers. It should be determined whether or not DDW management excludes experienced engineers from review of certain projects because DDW management fears our raising of design flaw issues that junior engineers, ill-trained by DDW management, will not discern.

In an abusive conduct complaint that Supervisor later filed against Onysko, she alleged that when she met with Onysko to discuss the evaluation, he threatened to "expose information showing that [Supervisor] had improperly monitored other [DDW] review engineers" unless she removed the room-for-improvement comment from his evaluation.

¶6    The following month, Supervisor issued a written warning to Onysko (the 2016 Warning). In it, Supervisor informed Onysko that she "received numerous verbal and two written complaints" from DDW staff and customers about him. She stated that "[t]he complaints have had a consistent theme, the individuals felt that they could not work with you collaboratively or efficiently, and the customers indicated that they were being harassed or abused." Supervisor continued that "[m]any of these complaints are actually related to your communication style and your demeanor perceived by the customers and co-workers," and after speaking with Onysko about the complaints, she had determined that his conduct violated DEQ policy. Supervisor then listed six directives Onysko was to follow and concluded by warning that "if similar

unsatisfactory behavior occurs in the future, further corrective and/or disciplinary action may be taken which may include termination of your employment."

¶7     A little over a week later, Onysko filed a complaint with the federal Occupational Safety and Health Administration (OSHA), alleging that the 2016 Warning was retaliatory and in violation of the federal Safe Drinking Water Act. OSHA eventually dismissed this complaint on the ground that "the content did not 'relate definitively and specifically to the subject matter' of the [Safe Drinking Water Act]."

¶8     In November 2016, Onysko filed a grievance concerning the 2016 Warning and, on that same day, filed six record requests under the Utah Government Records Access and Management Act (GRAMA), *see* Utah Code Ann. §§ 63G-2-101 to -901 (LexisNexis 2019),[2] for all of Supervisor's telephone records spanning the prior six months. During a subsequent investigation by the Department of Human Resource Management (DHRM), Onysko stated that he did not limit the requests to the issues in the 2016 Warning because "he did not know the phone numbers of the two parties who made [written] complaints against him."[3] He also, as the assigned hearing

---

2. Because the statutory provisions in effect at the relevant time do not differ in any way material to our analysis from those now in effect, we cite the current version of the Utah Code for convenience.

3. The CSRO Decision noted that the DHRM investigator discounted this explanation, "reasoning that [Onysko] already knew the phone numbers of relevant parties, thus making a request for all calls unnecessary." The CSRO Decision further noted that the timing of the GRAMA requests "further discounts his explanation" because although the 2016 Warning was issued in mid-October, Onysko did not make the GRAMA requests

(continued…)

officer later found, "more likely than not" left a copy of the GRAMA requests on Supervisor's desk.

¶9    On December 16, 2016, Supervisor issued Onysko a "Notice of Intent to Discipline—Written Reprimand" (the Intent to Reprimand) concerning a November 2016 incident with a non-DDW employee.[4] Specifically, Onysko had missed a morning appointment with the employee, and after it was pointed out to him that he had accepted the appointment to his calendar, Onysko "became extremely upset and yelled at" the employee. Onysko questioned why the employee had not called him when he had not appeared for the appointment, and it was explained to him that it was not the employee's responsibility to

_____

(…continued)

until mid-November, on "the same day he filed his grievance." Ultimately, on this issue, quoting rule R477-16-1(1)(a) of the Utah Administrative Code, the CSRO Decision concluded that "[e]ven though [Onysko's] request was technically legitimate, the scope of the documents requested, the unnecessary notification of [Supervisor], and the unlikely explanation offered by [him], lead to the conclusion that [Onysko] intended to [and did] cause [Supervisor] 'intimidation, humiliation, or unwarranted distress,'" thereby amounting to abusive conduct.

4. The original Intent to Reprimand referred generally to "an incident that Occurred on Wednesday November 9, 2016, involving [Onysko] and a non-DDW employee in the [state office] building." In early January 2017, Supervisor supplemented the Intent to Reprimand to include the details of the incident at issue after Onysko pointed out in his written response to the original Intent to Reprimand that the document did not provide specifics. For ease of recounting the facts of this case, we refer to the original and amended letters collectively as "the Intent to Reprimand."

do so. Onysko responded that the situation was "ridiculous" and that he did not understand why the employee had not called him. The employee apologized, and Onysko responded, "I'm not upset; I'm just disappointed." In the Intent to Reprimand, Supervisor described Onysko's conduct as inappropriate, a cause for grave concern, and in violation of the DEQ Code of Conduct. She further noted that this "incident and previous complaints against [him] all share a similar theme of unprofessional and impolite communication with others." As a result, Supervisor notified him that she intended to discipline him "in the form of a Written Reprimand."

¶10 Supervisor and a DHRM representative (DHRM Representative) met with Onysko to deliver and discuss the Intent to Reprimand, but he quickly became upset and cut the meeting short, citing health reasons. As a result, Supervisor and DHRM Representative left the Intent to Reprimand on Onysko's desk. The next business day, Onysko met with DHRM Representative to discuss the document. He then informed DHRM Representative that he intended to file a criminal complaint regarding the manner in which she and Supervisor had delivered the Intent to Reprimand on the previous work day.

¶11 After receiving the Intent to Reprimand, but before Supervisor issued the corresponding "Notice Imposing Discipline—Written Reprimand" (the Written Reprimand), Onysko filed another GRAMA records request for "all sanitary survey reports performed by [Supervisor]," a copy of which he also "more likely than not" left on Supervisor's desk.[5] He also

5. In a subsequent DHRM investigation, Onysko stated that he made the request because "he wanted to see if [Supervisor] had made the same kinds of errors in her reports for which she (in part) had issued [Onysko the Written Reprimand]." The CSRO Decision concluded that Onysko "had no work-related reason to

(continued…)

filed an abusive conduct complaint against Supervisor with DHRM.

¶12   In mid-January 2017, Supervisor issued the Written Reprimand, informing Onysko that "[t]his Letter also serves as a notice that if misconduct continues to occur, I will consider further disciplinary action, which may include termination of your employment." Onysko protested the Written Reprimand on the ground that it did not include mandatory right-to-appeal language, and a subsequent letter—identical to the original but with the mandatory language included—was issued 10 days later. Onysko filed a grievance challenging the amended Written Reprimand, which DEQ's executive director (Executive Director) denied, along with Onysko's earlier grievance related to the 2016 Warning.

¶13   Less than a week after receiving the Written Reprimand, Onysko delivered a copy of his abusive conduct complaint, made to DHRM two weeks earlier, to Supervisor. Supervisor, in turn, filed an abusive conduct complaint against Onysko. In her complaint, she made seven allegations of abusive conduct:

> i.   That [Onysko], after receiving the [Intent to Reprimand], told [DHRM Representative] that he intended to file a criminal complaint regarding the circumstances of the document's December 16, 2016 delivery.

---

(…continued)

review [Supervisor's] prior projects" and that "[t]he existence of such errors by [Supervisor] would be irrelevant to the Written Reprimand" because "they would not excuse or balance out [Onysko's] conduct." Therefore, quoting rule R477-16-1(1)(a) of the Utah Administrative Code, the CSRO Decision stated that Onysko's "conduct intended to cause [Supervisor], and did cause her, 'intimidation, humiliation, or unwarranted distress.'"

ii. That following the [2016 Warning], [Onysko] filed multiple records requests under GRAMA for all of [Supervisor's] telephone records over a six-month period, and that he left copies of the GRAMA requests on [Supervisor's] desk.

iii. That following his receipt of the [Written Reprimand], [Onysko] made a records request under GRAMA for all sanitary survey reports done by [Supervisor], and again left a copy of the request on [her] desk.

iv. That Onysko's [verbal] comments [made in a meeting concerning] the July 2016 evaluation threatened [Supervisor].

v. That on April 7, 2016, [Onysko] complained to another manager about [Supervisor's] conduct in an April 6, 2016 meeting. [Supervisor] asserted [Onysko's] conduct was abusive because the victim of the conduct did not consent to the complaint.

vi. That on February 28, 2017, [Onysko] commented to staff that [Supervisor] had inappropriately revealed confidential information.

vii. That [Onysko] "intentionally spreads lies to harm [Supervisor's] professional reputation."

¶14    DHRM dismissed Onysko's complaint against Supervisor in April 2017. And in May, DHRM issued an investigation report (the Investigation Report) substantiating Supervisor's first four

allegations in her abusive conduct complaint against Onysko[6] but determining that the last three allegations, which it found had in fact occurred, did not rise to the level of abusive conduct.[7] *See* Utah Admin. Code R477-16-1(1) (defining abusive conduct).

¶15 In June 2017, pending its review of the Investigation Report, DEQ placed Onysko on paid administrative leave. And in July, the DDW director issued Onysko an "Intent to Discipline—Dismissal for Just Cause and the Good of the Public Service" (the Intent to Dismiss). The document listed several reasons for her intent to terminate Onysko's employment: (1) the 2006 Warning, (2) the 2008 Warning, (3) the 2016 Warning, (4) the Intent to Reprimand, (5) the Investigation Report,[8] (6) a

---

6. At the time DHRM issued the Investigation Report, there was no procedure in place through which an employee could seek review of the findings of an abusive conduct investigation. In 2018, the Legislature established such a process for the CSRO, enabling it to review the findings of abusive conduct investigations. *Compare* Utah Code Ann. § 67-19a-202 (LexisNexis Supp. 2016), *with id.* § 67-19a-202(3) (Supp. 2018).

7. Onysko did not receive a copy of the Investigation Report until after DEQ terminated his employment. Instead, DHRM sent Onysko a confusingly phrased letter informing him that "[i]t is the opinion of the investigators that the complaint that you engaged in nonverbal conduct intended to intimidate, humiliate or cause you unwarranted distress in violation of the above-cited Abusive Conduct rule is substantiated."

8. The Intent to Dismiss limited its discussion of the Investigation Report to the following:

> This investigation substantiated that you used
> the normally unobjectionable activities of filing
> GRAMA requests to intentionally intimidate and

(continued…)

lack of improvement "[d]espite performance coaching and escalating disciplinary actions," and (7) his "misconduct [being] disruptive to the workplace" and "caus[ing] burdensome delays in [DDW] processes and damage to the morale within [DDW]." The director gave several examples of Onysko's conduct to illustrate the last point: (i) his "intimidating threats" had caused "staff [to spend] unnecessary effort to excessively check, re-check and document decisions in an effort to shield themselves against [his] intimidating threats"; (ii) his "unnecessary project scrutiny and . . . uncollaborative communication style" had resulted in increased project completion times and unwarranted administrative processing; (iii) his repeated research and critiques of his coworkers' projects and accusations of incompetence had resulted in unnecessary and burdensome delays; (iv) his repeated threats and follow-through with complaints to the Division of Occupational and Professional Licensing (DOPL) against other engineers had resulted in coworkers requesting not to work with him; (v) his behavior had

---

(…continued)

> cause unwarranted distress to [Supervisor]. The investigation also substantiated that you threatened to file criminal charges in response to standard management practices, and that you threatened [Supervisor] over a performance evaluation.
>
> Importantly, in reaching their determination that you had engaged in abusive conduct, the investigators noted a consistent and troubling pattern of using otherwise unobjectionable activities like filing GRAMA requests and complaints, administrative or otherwise, to intimidate or distress co-workers as well as management.

caused DDW clients to express frustration with working with him, resulting in his coworkers being burdened with extra workloads; and (vi) his refusal to use DDW templates and common standard editing practices had resulted in project delays and unnecessary administrative processing.

¶16    On August 1, 2017, Onysko, now represented by counsel, met with Executive Director to discuss the Intent to Dismiss. In support of his position, Onysko "submitted 162 pages of documents and spent two hours arguing [his] case verbally." And in October, after Onysko's counsel informed DEQ that he no longer wished to pursue settlement discussions, Executive Director issued a letter entitled "Final Agency Decision—Termination" (the Termination Letter). The Termination Letter incorporated the Intent to Dismiss but also discussed three additional grounds: (1) referencing Supervisor's last three allegations that the Investigation Report concluded did not amount to abusive conduct, Executive Director stated that his "review of th[ose] allegations shows that they at least illustrate the disruptive nature of [Onysko's] behavior in [DDW] and [his] unjustified hostility and ill feelings toward [Supervisor]"; (2) the OSHA complaint Onysko originally filed in response to the 2016 Warning[9] and certain prior unsuccessful OSHA complaints he had filed against DDW that had by that point already been "rejected and defeated at every level of review," including the Tenth Circuit Court of Appeals; and (3) that since Onysko had been placed on administrative leave, "both morale and production are up in [DDW]," serving as "further evidence that [his] actions, behavior, and contentious dealings toward [his] supervisors and co-workers have been disruptive to [DDW]."

---

9. In January 2017, Onysko amended his OSHA complaint to allege that the Written Reprimand, the Intent to Reprimand, and the attempted service thereof were also retaliatory.

*The CSRO Proceedings*

¶17   Onysko appealed his termination to the CSRO. *See* Utah Code Ann. § 67-19a-202(1) (LexisNexis Supp. 2019). A hearing officer (the Hearing Officer) was assigned to consider the matter and held a seven-day level 4 evidentiary hearing in mid-2018, in which Onysko represented himself.[10] *See id.* § 67-19a-302(1); Utah Admin. Code R137-1-18(2)(a) ("Level 4 adjudications at the CSRO are formal adjudicative proceedings."). At issue was (1) whether DEQ's "termination of [Onysko's] employment [was] supported by just cause, or to advance the good of the public service" and (2) whether DEQ "correctly appl[ied] relevant policies, rules, and statutes."

¶18   Onysko did not testify during the hearing. When his opportunity to testify arose, he "brought a binder of notes and documents to the witness table to use in testifying." Citing rule 612(b) of the Utah Rules of Evidence,[11] the Hearing Officer asked

_____

10. The hearing was originally scheduled for three days, but it was extended by an additional four days due to Onysko's "conduct and presentation of his case," specifically his "insist[ence] on continuing conduct that delayed the progress of the hearing." The CSRO Decision concluded that "[a]lthough some delay in the progress of the hearing may be reasonably . . . attributed to his *pro se* status, much of the delay was a direct result of [Onysko's] inefficient presentation of his case and his disregard of previous rulings, orders, explanations, and directions."

11. Rule 612 regulates a witness's ability to use "a writing" to refresh the witness's recollection. Subsection (b) details the procedure for the writing being produced and examined. Although recognizing "that the Utah Rules of Evidence do not apply to CSRO proceedings," *see* Utah Admin. Code R137-1-18(3), the Hearing Officer nonetheless applied rule 612(b)

(continued…)

Onysko not to refer to the binder during his testimony. A discussion on the subject ensued, and Onysko eventually permitted the Hearing Officer to conduct an in-chambers inspection of the binder. Following his review of the binder, the Hearing Officer determined that it contained Onysko's "notes and work product, intended to guide [his] testimony" and instructed Onysko "to remove those documents, or identify, or provide copies of those documents to [DEQ] before testifying." Onysko refused to do so and, as a consequence, did not testify at that point.

¶19 The Hearing Officer later gave Onysko a second opportunity to testify, but Onysko, claiming the binder he intended to use during his testimony contained "protected work product and that review would disclose his hearing strategy to the Hearing Officer," refused to permit another in-chambers inspection of it. The Hearing Officer again "explained that if [Onysko] did not testify, the record would contain little evidence in support of his case," but Onysko nevertheless declined inspection and consequently did not testify. At the conclusion of the seven-day hearing, the Hearing Officer directed Onysko to submit a written proffer of the testimony he would have given. Onysko submitted the proffer, and the Hearing Officer "generally accept[ed] the facts asserted therein . . . as true." The Hearing Officer further noted that "[t]hose facts do not contradict other testimony or evidence in any material way."

---

(…continued)

because he "believe[d] the approach set out in the Rule ensures fairness to both parties and minimizes the possibility that inadmissible or unreliable evidence may be introduced into the record." *See* Utah Code Ann. § 63G-4-206(2) (LexisNexis 2019) (stating that officers presiding over formal adjudicative proceedings are not precluded "from taking appropriate measures necessary to preserve the integrity of the hearing").

*The CSRO Decision*

¶20   Following the hearing, the Hearing Officer issued the CSRO Decision upholding DEQ's dismissal of Onysko. In reaching this conclusion, the CSRO Decision stated that it did not rely on the 2006 Warning or the 2008 Warning as they were "too remote in time to be relevant to the termination of [Onysko's] employment" but did find the 2016 Warning and the Written Reprimand to be relevant.

¶21   The CSRO Decision first addressed Onysko's argument that DEQ "did not notify [him] in writing of the specific reasons for the proposed dismissal or demotion," in contravention of rule R477-11-2(2)(a) of the Utah Administrative Code. The CSRO Decision acknowledged that Onysko did not receive a copy of the Investigation Report until after his termination and that the DHRM letter informing him of the outcome of the investigation "makes little sense and does not describe the alleged abusive behavior." Nevertheless, the CSRO Decision concluded that Onysko "received adequate notice of [DEQ's] charges against him," because he "received other notifications of the reasons for [DEQ's] decision to terminate [his] employment."

¶22   Specifically, the Intent to Dismiss referred to the 2006 Warning, the 2008 Warning, the 2016 Warning, the Intent to Reprimand, and the Investigation Report. And although the Intent to Dismiss "did not describe the allegations in the Investigation Report in detail," it "did refer to the filing of GRAMA requests, threats to file a police report, . . . threats to [Supervisor] over a performance evaluation," and "the disruptive effect of [Onysko's] conduct on the workplace and the performance of DDW." Based on this, the CSRO Decision concluded that Onysko "was sufficiently on notice as to the allegations underlying [DEQ's] decision to recommend termination of employment" and that "[a] reasonable person reading the [Intent to Dismiss] and the [Termination Letter] would understand the reasons, including the specific instances

of abusive conduct for [DEQ's] decision to terminate [Onysko's] employment." This conclusion was further supported by the absence of evidence that Onysko ever "asked for clarification or amplification of any of [the] documents prior to this proceeding" and by Onysko's ability "to present his reasons and arguments why his employment should not be terminated" in his August 1, 2017 meeting with Executive Director.

¶23   The CSRO Decision next addressed whether DEQ had cause to terminate Onysko's employment. After noting that DEQ largely based its decision on the Investigation Report's findings of abusive conduct, the CSRO Decision acknowledged that DEQ "also relied on the repetitive nature of [Onysko's] conduct including prior discipline, the likelihood that [Onysko's] conduct would not improve the effect of [Onysko's] conduct on [DDW] morale, the effect of [Onysko's] conduct on [DDW] productivity, and [Onysko's] violation of DEQ and DDW policies."

¶24   As concerns Onysko's abusive conduct, the Hearing Officer concluded that "[t]here is substantial evidence supporting the conclusion that the conduct alleged in each of the seven individual allegations [in Supervisor's abusive conduct complaint] did occur." Like the Investigation Report, the CSRO Decision concluded that only Supervisor's first four allegations against Onysko constituted abusive conduct, but the CSRO Decision stated that the Hearing Officer considered the conduct described in the latter three allegations as corroborative of other evidence of Onysko's improper conduct. The CSRO Decision further determined that the conduct described in the first four allegations—as well as Onysko's conduct affecting DEQ customers, productivity, and morale—violated DEQ Policies and Procedures and DDW Operating Principles.

¶25   And with regard to the effect of Onysko's conduct on DEQ customers, productivity, and morale, the CSRO Decision noted that "[t]he consensus of the witnesses was that [DEQ] morale was poor, that the poor morale was due to [Onysko's]

conduct, and that [DEQ] productivity and morale improved after [Onysko] left [DEQ]." The CSRO Decision further stated that Onysko's "conduct throughout this proceeding also tends to corroborate the testimony of [DEQ's] witnesses and supports [DEQ's] assessment of [Onysko's] conduct and its effect on [DEQ]" as "disruptive, morale-breaking, and intimidating."

¶26 The CSRO Decision gave several examples of such in-hearing conduct. First, "after being specifically directed that such questioning was inappropriate," Onysko nonetheless "[o]n at least three occasions . . . objectively intimidated or unsettled a witness by referring to the Fifth Amendment, or to the fact that they were testifying under oath when there was no legitimate reason to use such a question to verify their truthfulness or credibility."

¶27 Second, in a motion to compel, DEQ's counsel stated that Onysko had requested a stay in discovery "in part to avoid responding to the discovery requests." In response, Onysko wrote:

> Grievant respectfully cautions [DEQ's] Counsel that if he persists in scurrilous attacks on Grievant, [DEQ's] Counsel will do so at peril of Utah Bar complaint by Grievant alleging unethical conduct by [DEQ's] Counsel. [DEQ's] Counsel has a history of his being known in Utah legal circles in general, and known to Grievant in particular, for being *untethered to the truth*,[12] and Grievant will not

12. The emphasis was supplied by Onysko. The CSRO Decision noted that Onysko "did not provide, and has not yet provided, any evidence whatsoever in support of this remarkable accusation" but commented "that throughout th[e] proceeding, [DEQ's counsel] has acted as an honest, ethical, and capable member of the bar."

> abide unchallengingly by such conduct in Grievant's matters again.
>
> Grievant demands that [DEQ's] Counsel retract his scurrilous allegation that Grievant requested a stay in discovery in this matter "in part to avoid responding to the discovery requests."

And throughout the rest of Onysko's response to DEQ's motion to compel, he referred to DEQ's counsel's "willful deceit," "misrepresentation," "untruthfulness," and "vacuous, inane argument." He also "continued to allege professional misconduct and untruthfulness by [DEQ's] counsel throughout this proceeding."

¶28 Third, Onysko exhibited similar behavior toward the Hearing Officer. In various motions filed throughout the proceeding, Onysko "stated that the Hearing Officer 'shamelessly discounted written testimony,'" that the "proceeding was 'rife with judicial error,' that the Hearing Officer's conduct was 'illegitimate,' and that the Hearing Officer's 'specious argument' was 'patently false and illegitimate.'" Onysko also claimed that "a reasonable person would infer poorly-veiled Hearing Officer bias," and that he "is appalled that the Hearing Officer has abused his authority in concocting fake legal arguments with no foundation in recognized precedent." And during the evidentiary hearing, Onysko "made multiple references to the certainty and outcome of his appeal if he did not prevail."

¶29 The CSRO Decision thus concluded that Onysko's "objectively intimidating" "conduct throughout th[e] proceeding demonstrates that his preferred method to address a difference of opinion is to threaten, intimidate, belittle, and otherwise attack the other party" and that such conduct would "tend to adversely affect the morale of coworkers and others." The CSRO Decision further stated that in exhibiting such

conduct in "a formal proceeding intended to determine whether or not he returns to work for [DEQ]," Onysko "demonstrated a reasonable likelihood that this conduct would also extend to supervisors and superiors." The CSRO Decision concluded that Onysko's "conduct in the hearing thus tends to corroborate the testimony of [DEQ] witnesses," and based on the corroborated testimony, the Hearing Officer determined that "[s]ubstantial evidence supports the conclusion that [Onysko's] conduct adversely affected [DEQ] customers, productivity, and morale."

¶30    After next determining that DEQ's "decision to terminate [Onysko] was neither disproportionate nor inconsistent" and "was not an abuse of its discretion," the CSRO Decision affirmed DEQ's termination of Onysko's employment. Onysko now seeks judicial review of the CSRO Decision. *See* Utah Code Ann. § 67-19a-406(6) (LexisNexis Supp. 2019).


ISSUES AND STANDARDS OF REVIEW

¶31    Our review of the CSRO Decision is governed by the Utah Administrative Procedures Act (UAPA). *See* Utah Code Ann. § 63G-4-403(1) (LexisNexis 2019); *id.* § 67-19a-406(6) (Supp. 2019); *Macfarlane v. Career Service Review Office*, 2019 UT App 133, ¶ 29, 450 P.3d 87. Under UAPA, we may grant relief only if the petitioner "has been substantially prejudiced" by certain errors enumerated in Utah Code section 63G-4-403(4). Unless section 63G-4-403(4) incorporates a specific standard of review, the standard of review for alleged agency error "depend[s] on the type of action in question," and "we are free to apply our traditional approach for selecting an appropriate standard of review," depending on whether the agency action "can be characterized as a question of law, a question of fact, or a mixed question of law and fact." *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶¶ 21–22, 308 P.3d 461.

¶32 Onysko raises four claims of error that we address on the merits.[13] He first takes issue with the CSRO Decision's discussion of his conduct during the seven-day hearing. He argues that the Hearing Officer relied on improper propensity evidence to infer "that because [he] supposedly acted a certain way during the Hearing itself, it is likely he acted that same way during the time at issue in the Hearing." For the reasons discussed in Section I, we agree with DEQ that the references are better characterized as an explanation of the Hearing Officer's resolution of conflicting evidence concerning the effect of Onysko's misconduct on DEQ morale and productivity—and not as propensity evidence.[14]

---

13. Onysko also argues that the Hearing Officer erroneously concluded that his "termination was proportionate and consistent" but only after "all of the Hearing Officer's improper findings and conclusions" are disregarded. Because his other claims of error are unavailing, we do not reach this issue.

14. By characterizing the Hearing Officer's references to his in-hearing conduct as improper propensity evidence, Onysko implicitly invokes rule 404 of the Utah Rules of Evidence. Indeed, the cases Onysko relies on in making this argument specifically address propensity evidence in the context of rule 404. We note that level 4 proceedings at the CSRO are not subject to "[t]he technical rules of evidence . . . as observed in the courts of law, . . . except for the rules of privilege as recognized by law and those specific references to the rules of evidence and procedure as set forth in the UAPA." Utah Admin. Code R137-1-18(3). *See Frito–Lay v. Utah Labor Comm'n*, 2009 UT 71, ¶¶ 17–18, 222 P.3d 55 (stating that "[w]e are powerless to impose our court rules," such as our rules of procedure and evidence, "on proceedings outside of state

(continued…)

¶33 It is well recognized that "when the evidence is disputed, . . . we defer to the [agency's] assessment of credibility and resolution of conflicting evidence." *Dinger v. Department of Workforce Services*, 2013 UT App 59, ¶ 20, 300 P.3d 313 (quotation simplified). *See also Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242 ("We defer to an administrative agency's findings because when reasonably conflicting views arise, it is the agency's province to draw inferences and resolve these conflicts.") (quotation simplified); *Johnson v. Department of Emp't Sec.*, 782 P.2d 965, 972 n.9 (Utah Ct. App. 1989) ("[T]he agency trier of fact has the same discretion as a trial judge in determining the credibility of evidence."). In light of this well-established principle and legislation permitting officers presiding over formal adjudicative proceedings to "use [their] experience . . . to

---

(…continued)

and local courts," including "[a]dministrative adjudications"). And UAPA is entirely silent as to this particular evidentiary question. *See generally* Utah Code Ann. §§ 63G-4-206, -208 (LexisNexis 2019). But Onysko's argument before this court omits any discussion of how his implicit rule 404 argument would nonetheless apply to level 4 proceedings. And we are doubtful that it would. *Cf. Frito–Lay*, 2009 UT 71, ¶ 18 ("In the event that the legislature and the administrative agency are both silent as to the procedure that governs a particular situation, we still may not impose our rules to fill the gap."). Thus, even if we agreed with Onysko that the CSRO Decision's references to his in-hearing conduct amounted to propensity evidence, his argument would still ultimately prove unavailing because he has not met his burden of persuasion as concerns that question. *See Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 ("An appellate court is not a depository in which a party may dump the burden of argument and research.") (quotation simplified).

evaluate the evidence," Utah Code Ann. § 63G-4-208(2) (LexisNexis 2019), we conclude that "the Legislature . . . has delegated discretion to the agency within the meaning of section 63G-4-403(4)(h)(i)" to resolve conflicting evidence, and we therefore review this issue for an abuse of discretion, *Murray*, 2013 UT 38, ¶ 30.

¶34 "[T]he appellate court will review . . . [a] discretionary decision for an 'abuse of discretion' to ensure that it falls within the bounds of reasonableness and rationality. Reasonableness, in turn, is essentially a test for logic and completeness rather than the correctness of the decision." *Id.* ¶ 32. But our review of this first issue does not end at this. Because "we can grant relief under [section 63G-4-403(h)(i)] only after reviewing the [CSRO's] determination of fact for a lack of substantial evidence," *id.* ¶ 19, our review additionally incorporates a substantial-evidence standard. "Substantial evidence is more than a mere scintilla of evidence though something less than the weight of the evidence, and the substantial evidence test is met when a reasonable mind might accept as adequate the evidence supporting the decision." *Foye v. Labor Comm'n*, 2018 UT App 124, ¶ 16, 428 P.3d 26 (quotation simplified).

¶35 Onysko's next two arguments implicate the Due Process Clause of the Fourteenth Amendment. He contends that the CSRO Decision violated his due process rights when it (A) upheld DEQ's decision on reasons not communicated to Onysko prior to termination and (B) concluded that he received meaningful pre-termination notice. "Questions regarding whether an administrative agency has afforded a petitioner due process in its hearings are questions of law," *Lopez v. Career Service Review Board*, 834 P.2d 568, 571 (Utah Ct. App. 1992), and fall within the purview of Utah Code section 63G-4-403(4)(d), meaning they are reviewed without deference, for correctness.

¶36　Onysko's last argument implicates the residuum rule[15] by assailing several of the Hearing Officer's findings of fact on the ground that they are exclusively based on hearsay. This allegation of error likewise falls within the scope of section 63G-4-403(4)(d). *See Prosper, Inc. v. Department of Workforce Services*, 2007 UT App 281, ¶ 8, 168 P.3d 344. Thus, "[w]hether the [CSRO] erroneously applied the residuum rule is a question of law, which we review for correctness." *BMS Ltd. 1999, Inc. v. Department of Workforce Services*, 2014 UT App 116, ¶ 2, 327 P.3d 582. Additionally, "[t]he determination of whether evidence constitutes hearsay is a question of law that we review" de novo. *Prosper*, 2007 UT App 281, ¶ 8.

ANALYSIS

I. Onysko's In-hearing Conduct

¶37　Onysko argues that the CSRO Decision erroneously relied on his conduct throughout the course of the seven-day hearing to substantiate DEQ's allegation that his conduct negatively impacted DEQ morale and productivity. Although Onysko frames the CSRO Decision's use of his in-hearing conduct as an improper propensity inference, we agree with DEQ that the conduct was used in a more limited way, i.e., to help resolve conflicting evidence by confirming the considerable testimony offered on the subject—and not as primary substantive evidence.

---

15. "The residuum rule requires that an administrative [agency's] findings of fact be supported by a residuum of legal evidence competent in a court of law even if the [agency] has received and considered evidence of a lesser quality." *Aura Spa & Boutique v. Department of Workforce Services*, 2017 UT App 152, ¶ 11, 402 P.3d 813 (quotation simplified).

¶38    It was only after the Hearing Officer reviewed in the CSRO Decision DEQ's evidence offered in support of the contention that Onysko's conduct negatively impacted productivity and morale that the Hearing Officer stated that Onysko's "conduct throughout this proceeding also tends to corroborate the testimony of [DEQ's] witnesses and supports [DEQ's] assessment of [Onysko's] conduct and its effect on [DEQ]." With this preface, the CSRO Decision then proceeded to discuss Onysko's "objectively intimidating" behavior toward witnesses, DEQ's counsel, and even the Hearing Officer. And although the CSRO Decision did state that "[i]f [Onysko] habitually indulged in such conduct in a formal proceeding intended to determine whether or not he returns to work for [DEQ], it is likely that he did no less in his everyday work environment," this statement was immediately followed, with our emphasis, by the conclusion that Onysko's "conduct in the hearing thus *tends to corroborate* the testimony of [DEQ] witnesses as to the disruptive, morale-breaking, and intimidating nature of [Onysko's] conduct." Based on this, we agree with DEQ that the Hearing Officer used Onysko's in-hearing conduct only as confirmation of the considerable testimony already offered by DEQ's witnesses and not for propensity purposes. Our review is therefore limited to whether the Hearing Officer abused his discretion in considering Onysko's in-hearing conduct.

¶39    UAPA expressly authorizes officers presiding over formal adjudicative proceedings to rely on their own experience when evaluating evidence. Utah Code Ann. § 63G-4-208(2) (LexisNexis 2019). Here, the Hearing Officer observed and interacted with Onysko for a significant period of time (as opposed to a more typical shorter hearing) and did not premise any of the findings solely on those observations. Rather, the Hearing Officer used the observations as confirmation of DEQ's evidence with respect to Onysko's difficult manner and his negative effect on morale and productivity, which was a matter of disagreement between

the parties that the Hearing Officer was tasked with resolving. *See* Utah Admin. Code R137-1-21(3)(a). Thus, under the circumstances of this case, the Hearing Officer's consideration of Onysko's in-hearing conduct fell "within the bounds of reasonableness and rationality."[16] *See Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 32, 308 P.3d 461.

## II. Due Process

¶40    "Where state or local law establishes a public employee's right to continued employment absent cause for discharge, that employee holds a property interest in continued employment that is protected by the Due Process Clause of the Fourteenth Amendment." *Becker v. Sunset City*, 2013 UT 51, ¶ 13, 309 P.3d 223. It is undisputed that Onysko, a level III environmental engineer with career service status, held such a property interest in his continued employment with DEQ. *See* Utah Code Ann. § 67-19-18(1) (LexisNexis 2016).

¶41    "The essential requirements" of due process "are notice and an opportunity to respond—the opportunity to present reasons, either in person or in writing, why proposed action

---

16. Concerning the second portion of our review, i.e., whether substantial evidence supported the Hearing Officer's findings of fact regarding Onysko's conduct, *see Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 19, 308 P.3d 461, it is clear that "a reasonable mind might accept as adequate the evidence supporting the" CSRO Decision's relevant findings, *see Foye v. Labor Comm'n*, 2018 UT App 124, ¶ 16, 428 P.3d 26 (quotation simplified). DEQ presented several witnesses who testified regarding Onysko's abusive conduct and its effect on DEQ morale and productivity, and "[t]he consensus of the witnesses was that [DEQ] morale was poor, that the poor morale was due to [Onysko's] conduct, and that [DEQ] productivity and morale improved after [Onysko] left."

should not be taken." *Larsen v. Davis County*, 2014 UT App 74, ¶ 12, 324 P.3d 641 (quotation simplified). In other words, "minimum due process entitles an employee to oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to present his or her side of the story in something less than a full evidentiary hearing." *Lucas v. Murray City Civil Service Comm'n*, 949 P.2d 746, 753 (Utah Ct. App. 1997) (quotation simplified). The purpose of the pre-termination hearing is to "serve[] as an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action," *Larsen*, 2014 UT App 74, ¶ 16 (quotation simplified), and the notice should be sufficiently specific so as to provide the employee an adequate opportunity to prepare for and respond to the employer's allegations in the pre-termination hearing, *cf. Fierro v. Park City Mun. Corp.*, 2012 UT App 304, ¶ 19, 295 P.3d 696 (providing that the same is required for post-termination hearings).

¶42    To successfully challenge a termination on due process grounds, the employee must not only identify the procedural errors that deprived the employee of due process but must also "establish how these procedural errors were harmful," *Lucas*, 949 P.2d at 755, i.e., that there is a "reasonable likelihood that the error affected the outcome of the proceedings,"[17] *Smith v.*

---

17. Onysko's reliance on *Salt Lake City Corp. v. Gallegos*, 2016 UT App 122, 377 P.3d 185, for the proposition that an appellate court "*must* set aside the [reviewing agency's] decision if it strays from considering the charges contained in the termination notice," *id.* ¶ 11 (emphasis added) (quotation otherwise simplified), is misplaced. This case, unlike *Gallegos*, is governed by UAPA, *see id.* ¶ 8, which authorizes appellate courts to grant relief *only* when the petitioner "has been substantially prejudiced" by an

(continued…)

*Department of Workforce Services*, 2010 UT App 382, ¶ 17, 245 P.3d 758 (quotation simplified). *See* Utah Code Ann. § 63G-4-403(4) (LexisNexis 2019) (permitting an appellate court to grant relief only if it determines the petitioner "has been substantially prejudiced" by certain enumerated errors).

¶43    Onysko raises two instances of alleged violations of his due process rights: (A) when the CSRO Decision relied on reasons not communicated to him prior to his dismissal to uphold DEQ's decision and (B) when the CSRO Decision concluded that he had received adequate pre-termination notice of the reasons for his dismissal. We address each contention in turn.

A.    Reliance on Reasons Not Communicated to Onysko Prior to Termination

¶44    Onysko argues that in affirming his termination, the Hearing Officer erred in "expressly rel[ying] on reasons of which [he] was given no notice prior to being terminated." Onysko argues that because DEQ was required to "notify [him] in writing of the specific reasons for the proposed dismissal," *see* Utah Admin. Code R477-11-2(2)(a), and because "[t]he only written notice of termination reasons [he] received before being terminated was the Intent to Dismiss[,] . . . the Hearing Officer was limited to considering evidence respecting the reasons offered in the 'four corners'" of the letter.

¶45    The specific reasons for his termination that Onysko challenges are (1) that he left a copy of his GRAMA requests on Supervisor's desk; (2) that he failed to follow the 2016 Warning's

_____

(…continued)

enumerated error, Utah Code Ann. § 63G-4-403(4) (LexisNexis 2019). Accordingly, UAPA, and not *Gallegos*, governs our review in this case.

six directives; (3) that his written comments to his performance evaluation caused Supervisor "intimidation, humiliation, or unwarranted distress"; (4) the fifth, sixth, and seventh allegations addressed in the Investigation Report; (5) that morale and productivity at DEQ had improved after he left DEQ; (6) that he "entered coworkers' project files, despite not having review authority over those projects or any other legitimate need to do so"; and (7) that he told DHRM Representative that "he was going to file a criminal complaint regarding the manner in which the Intent to Reprimand . . . had been delivered to him." We decline to disturb the CSRO Decision on any of these grounds.[18]

¶46    First, Onysko argues that the Hearing Officer's reliance on his unnecessary delivery of GRAMA requests to Supervisor was improper because he "had no pre-termination notice of these allegations." But the Intent to Dismiss did discuss the Investigation Report's substantiation of the allegation that he "used the normally unobjectionable activities of filing GRAMA requests to intentionally intimidate and cause unwarranted distress to . . . [S]upervisor." Onysko has not argued how this notice prevented him from sufficiently preparing for his meeting with Executive Director on August 1, 2017, which served as the pre-termination hearing for due process purposes. *See* Utah Admin. Code R477-11-2(2)(c). Indeed, although the Intent to Dismiss did not specifically name the act of delivering copies of the requests to Supervisor, Onysko

---

18. Onysko also challenges the CSRO Decision's discussion of his in-hearing conduct. But as discussed in Section I, the Hearing Officer did not exceed his discretion in considering Onysko's in-hearing conduct, because the conduct was corroborative of other evidence that Onysko negatively affected DEQ morale and productivity—a ground for termination that the Intent to Dismiss did include.

had actual notice of the specific allegation by virtue of his participation in the underlying investigation and incorporation by reference of the allegation via the reference in the Intent to Dismiss to the Investigation Report.[19] Supervisor alleged Onysko "left a copy of the GRAMA requests on her desk," and Onysko had an opportunity to reply to the allegation. Onysko has not claimed that he was caught unaware that the unnecessary delivery of the GRAMA requests to Supervisor formed the basis of the allegation that he used the requests "to intentionally intimidate and cause unwarranted distress to . . . [S]upervisor" and that he was unable to adequately respond to the allegation

---

19. Citing rule R477-11-2(2)(a)–(b) of the Utah Administrative Code, Onysko argues that "independent of the minimum requirements of due process, [he] was statutorily entitled to *written* notification of the *specific* reasons for his proposed termination and time to respond *before* that discipline was imposed." Although he is generally correct in this respect, this court has already held that failure to strictly comply with procedure does not automatically equate to a due process violation. In *Lucas v. Murray City Civil Service Commission*, 949 P.2d 746 (Utah Ct. App. 1997), this court held that although the employer "failed to strictly comply with its procedure" by not providing the employee with "written notification of the allegations," "the fundamental requirements of due process were met" because the employee "did in fact have [actual] notice of the pending charges and was able to respond to the charges before the termination was implemented" and "he was afforded a pretermination hearing in which he specifically addressed each charge and the evidence against him." *Id.* at 754–55 (quotation simplified). Ultimately, "the essential requirements" of due process remain "notice and an opportunity to respond." *Larsen v. Davis County*, 2014 UT App 74, ¶ 12, 324 P.3d 641 (quotation simplified). These requirements were satisfied in the case at hand.

during his meeting with Executive Director. *See Lucas*, 949 P.2d at 755. Accordingly, this allegation of a due process violation fails. *See Hugoe v. Woods Cross City*, 2013 UT App 278, ¶ 9, 316 P.3d 979 (concluding petitioner received due process because he "had actual notice of the basis for the pre-disciplinary hearing, . . . failed to adequately allege any harm resulting from any deficiencies in the written notice, and was afforded a pre-disciplinary hearing in order to respond to the allegations against him").

¶47 Second, Onysko challenges the Hearing Officer's finding that he "'ultimately failed to follow' the 'six specific directions' in the 2016 Warning." But the Hearing Officer did not use this finding as a ground for termination. Rather, he specifically stated that Onysko's "prior work record, including prior disciplinary actions, is relevant for the purpose of either mitigating or sustaining an agency's disciplinary decision," and he discussed this particular finding in that context. *See* Utah Admin. Code R137-1-21(9) ("In those proceedings where a disciplinary penalty is at issue, the past employment record of the employee is relevant for purposes of either mitigating or sustaining the penalty when substantial evidence supports an agency's allegations."). Because his failure to abide by the 2016 Warning's six directives did not form the basis for his termination, the finding did not implicate Onysko's due process rights.[20] *Cf. Hugoe*, 2013 UT App 278, ¶ 10 (holding that the

---

20. Onysko's reliance on *Fierro v. Park City Municipal Corp.*, 2012 UT App 304, 295 P.3d 696, is misplaced. *Fierro* set aside an appeal board's decision upholding termination on the ground that the board "purported to uphold the termination" based on instances of misconduct not discussed in the Termination Memo, *id.* ¶ 27, as opposed to the pre-termination notice, and remanded for the board "to consider whether the one ground that fell within the scope of the Termination Memo . . . was sufficient to

(continued…)

appeal board did not violate due process when it heard evidence concerning an incident that did not appear in the pre-termination notice because the board did not rely on that incident and had an independent, properly-noticed ground upon which to uphold the petitioner's termination).

¶48   And in any event, even if the Hearing Officer had considered Onysko's failure to follow the six directives as a basis to uphold termination, such action would have been proper. The Intent to Dismiss did base its recommendation to dismiss Onysko on, among other things, the 2016 Warning. The letter further stated that "[t]he letters of warning and reprimand," including the 2016 Warning, "were issued in a genuine effort to assist [Onysko] in modifying [his] behavior so that [he] could successfully carry out the mission and vision of [DDW]," but "[d]espite performance coaching and escalating disciplinary actions, [his] behavior ha[d] not improved." Thus Onysko had an adequate opportunity to prepare for and respond to his

---

(…continued)

warrant Fierro's termination," *id.* ¶ 30. Here, the Hearing Officer expressly did not consider Onysko's failure to abide by the six directives as a ground for termination. Additionally, as concerns Onysko's other arguments, the Hearing Officer did not uphold his termination based on the fifth, sixth, and seventh allegations discussed in the Investigation Report but considered them as corroborating evidence of grounds set forth in the Intent to Dismiss. *See infra* ¶ 51. And similarly, the Hearing Officer considered evidence of improvement of productivity and morale in Onysko's absence as confirmatory of DEQ's allegation in the Intent to Dismiss that he negatively affected productivity and morale and not as a ground independent of this allegation. *See infra* ¶ 52. Moreover, because the Termination Letter did discuss the challenged corroborating evidence, Onysko was on notice to prepare to discuss that evidence at the CSRO hearing.

failure to follow the 2016 Warning's six directives in his meeting with Executive Director.[21]

¶49    Third, Onysko argues that the Hearing Officer violated his due process rights when he determined that Onysko's written comments in response to his performance evaluation caused Supervisor "intimidation, humiliation, or unwarranted distress." Although the Intent to Dismiss identified a threat to "a supervisor over a performance evaluation," Onysko argues that because the Intent to Dismiss referenced the Investigation Report in its discussion of this allegation and the Investigation Report substantiated that he *verbally* threatened Supervisor during a meeting and not by means of his written comments, he received notice only of the verbal threat. The Due Process Clause does not support such fine slicing and dicing. Onysko's written and verbal threats to Supervisor in response to the room-for-improvement comment are so intertwined that we are doubtful that such a distinction is meaningful. In fact, the Investigation Report based its substantiation of the verbal threat "on a plain reading of the actual comments put into the performance evaluation in question," concluding that "[t]he inclusion of those accusations in written form grants a great deal of credibility to [Supervisor's] claim that the discussion in June 2016 included this content."[22]

---

21. And as a matter of fact, the Termination Letter discussed that during the meeting with Executive Director, Onysko objected "to the issuance of [the 2016] Warning." This objection further supports the conclusion that Onysko was able to prepare to address the 2016 Warning and its six directives during the meeting.

22. Although Onysko did not obtain a copy of the Investigation Report until October 2017—well after his August 1, 2017 meeting with Executive Director—Onysko has not alleged that the

(continued…)

¶50  And in any event, Onysko has not explained how this alleged error was harmful. Although the Hearing Officer did discuss the impropriety of his written comments in the CSRO Decision, he also specifically found that Onykso "made similar comments in his meeting with [Supervisor] discussing the evaluation." It is unlikely that the Hearing Officer would consider certain comments "highly inappropriate" only when written but not when verbalized. As such, it is similarly unlikely the outcome of the proceeding would have been different had the Hearing Officer considered the verbal threats instead of their written counterpart as a ground for termination. *See Smith v. Department of Workforce Services*, 2010 UT App 382, ¶ 17, 245 P.3d 758.

¶51  Fourth, Onysko challenges the CSRO Decision's discussion of the fifth, sixth, and seventh allegations addressed by the Investigation Report, i.e., those allegations the Investigation Report concluded, although having occurred, did not amount to abusive conduct. But the Hearing Officer expressly stated in the CSRO Decision that he considered the fifth, sixth, and seventh allegations as "no more than corroboration of other evidence of [Onysko's] conduct" and not as independent bases supporting his termination. *See* Utah Admin. Code R137-1-21(1)(g) (authorizing officers presiding over formal adjudicative proceedings to "admit evidence that has reasonable and probative value"). *Cf. Becker v. Sunset City*, 2013 UT 51, ¶ 15, 309 P.3d 223 ("[An] appeal board may consider

---

(…continued)

deficiency in any way affected his ability to discuss the Intent to Dismiss's recommendation to terminate his employment with Executive Director. And the Investigation Report was provided to Onysko well in advance of the CSRO hearing, thereby permitting him to adequately prepare for that dispositive proceeding.

. . . evidence *related* to the grounds for discharge for which the employee has received proper notice.") (emphasis added). And although the Intent to Dismiss does not specifically reference the allegations, the Termination Letter does discuss them, thereby providing Onysko with notice and an opportunity to prepare to address the allegations during the CSRO hearing. In sum, the evidence was relevant to DEQ's allegations that Onysko engaged in abusive conduct, he received sufficient notice to allow him to prepare to address the allegations in the formal adjudicative proceeding, and he has not asserted that the Intent to Dismiss's failure to mention the allegations affected his ability to present his case during the August 1, 2017 meeting with Executive Director. Thus, the Hearing Officer did not violate Onysko's due process rights in treating the allegations as corroborative evidence.

¶52   Fifth, Onysko contends that because the Intent to Dismiss did not mention that productivity and morale had improved since he had been placed on administrative leave, the Hearing Officer violated due process when he relied on "[t]he consensus of the witnesses . . . that [DEQ] productivity and morale improved after [Onysko] left." This argument fails for much the same reason as Onysko's fourth argument. The improvement to morale and productivity was relevant to DEQ's allegation that Onysko's misconduct negatively affected the same. The CSRO Decision did not discuss this evidence in terms of a new, independent ground to uphold his dismissal. And although the Intent to Dismiss did not mention the improvement, it devoted a significant portion of its discussion to the negative impacts of Onysko's conduct on productivity and morale. Onysko has also not argued that the omission in the Intent to Dismiss prevented him from meaningfully presenting his case during his meeting with Executive Director, and the Termination Letter did discuss the improvement to DEQ productivity and morale after he left, thereby providing sufficient notice to enable him to prepare to address the evidence during the CSRO hearing.

¶53    Sixth, Onysko assails the Hearing Officer's finding that he "entered coworkers' project files, despite not having review authority over those projects or any other legitimate need to do so." He contends that although the Intent to Dismiss stated that he "repeatedly researched and criticized other employees' projects and accused co-workers of incompetence," "no reasonable person could glean from such statement that [he] was being accused of entering his fellow engineers' project files without authorization." But even assuming, without deciding, that Onysko is correct in this regard, this argument is unavailing because Onysko has not shown a "reasonable likelihood that the error affected the outcome of the proceedings." *See Smith*, 2010 UT App 382, ¶ 17 (quotation simplified).

¶54    The CSRO Decision briefly mentioned Onysko's unauthorized entry into coworkers' work files as evidence to support its conclusion that "[s]ubstantial evidence supports the conclusion that [Onysko's] conduct adversely affected [DEQ] customers, productivity, and morale." This conclusion was further supported by evidence that Onysko's coworkers "were 'on guard' against [him] and regularly took extra time to over-document their work," that they "were concerned that they would be the next target of [his] allegations of unprofessional conduct or violation of the professional engineers' code of ethics," that "productivity and morale improved after [he] left [DEQ]," and that his "usual reaction to any criticism or disagreement was to threaten the other person's professional license."[23] And the Intent to Dismiss gave Onysko adequate notice that the effect of his misconduct on DEQ morale and productivity was one of the reasons for his dismissal, discussing

---

23. Claiming residuum rule violations, Onysko argues that the Hearing Officer erred in considering much of this additional evidence. But, as discussed in Section III, those claims of error are likewise unavailing.

in detail how Onysko's conduct "caused burdensome delays in [DDW] processes and damage to the morale within [DDW]." Thus, because his alleged unauthorized entry into coworkers' files was probative of the effect of his misconduct on DEQ productivity and morale—a ground for termination of which both the Intent to Dismiss and Termination Letter provided notice—and because ample other evidence supported this ground, it is unlikely the CSRO Decision would not have substantiated this ground for termination had the challenged evidence not been before the Hearing Officer.

¶55 Lastly, Onysko argues he was deprived of due process when the Hearing Officer found that he told DHRM Representative "he was going to file a criminal complaint regarding the manner in which the [Intent to Reprimand] had been delivered to him." He contends that the Intent to Dismiss's statement that he "threatened to file criminal charges in response to standard management practices" "is not clear and specific as required," because "[n]o reasonable person could glean from such a statement that [he] was being accused of threatening to file a criminal complaint about the manner in which he received the Intent to Reprimand." But he omits that the Intent to Dismiss stated that the Investigation Report, with our emphasis, "*substantiated* that [he] threatened to file criminal charges in response to standard management practices." Because the threat was discussed in the context of the Investigation Report and because Onysko had actual notice of that allegation by virtue of his participation in the underlying investigation,[24] we reject Onysko's contention that the notice was inadequate. *See Hugoe v. Woods Cross City*, 2013 UT App 278, ¶ 9, 316 P.3d 979. The

---

24. Specifically, during the investigation, Onysko "denie[d] making any threat or representation that he would file a criminal complaint regarding issuance of the Intent to [Reprimand] issued on December 16, 2016."

Hearing Officer therefore was not precluded from considering that event as a ground supporting DEQ's termination decision.

B.     Pre-termination Notice

¶56    Onysko argues that the Hearing Officer also erred in concluding he received adequate pre-termination notice because he "did not receive written, clear, and specific pre-termination notice" of the above challenged evidence. But the Hearing Officer specifically found that "during his August 1, 2017 meeting with [Executive Director], [Onysko] was able to present his reasons and arguments why his employment should not be terminated." Indeed, during that two-hour meeting, Onysko was represented by counsel and presented over 162 pages of documents in support of his position. And in his petition for judicial review, Onysko has not challenged the Hearing Officer's finding or even asserted that the alleged inadequacies in the Intent to Dismiss in any way inhibited him from presenting his case during the meeting.

¶57    This finding is fatal to Onysko's pre-termination due process argument for two reasons. As an initial matter, the finding is detrimental to his claim that the Intent to Dismiss was not sufficiently specific. As discussed above, the notice need only be sufficiently specific to provide the employee an adequate opportunity to prepare for and respond to the employer's allegations in the pre-termination hearing. *Cf. Fierro v. Park City Mun. Corp.*, 2012 UT App 304, ¶ 19, 295 P.3d 696 (providing that the same is required for post-termination hearings). It therefore follows that if Onysko was able to adequately respond to DEQ's allegations during his meeting with Executive Director, the Intent to Dismiss served as sufficiently specific notice of those allegations.

¶58    Onysko's argument likewise fails because reviewing courts may not set aside agency decisions absent a showing of substantial prejudice. *See* Utah Code Ann. § 63G-4-403(4)

(LexisNexis 2019). *See also Lucas v. Murray City Civil Service Comm'n*, 949 P.2d 746, 755 (Utah Ct. App. 1997) (stating that the employee must explain how the alleged "procedural errors were harmful" in order to establish a due process violation). In other words, Onysko was required to demonstrate "that there is [a] reasonable likelihood that the error affected the outcome of the proceedings." *Smith v. Department of Workforce Services*, 2010 UT App 382, ¶ 17, 245 P.3d 758 (quotation simplified). And Onysko cannot make this showing without challenging the Hearing Officer's finding, which he has not done.

¶59 Accordingly, for these reasons and those discussed in Section II(A), we reject Onysko's argument that the Intent to Dismiss violated his due process rights.

### III. Residuum Rule

¶60 Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted." Utah R. Evid. 801(c). Although officers presiding over formal adjudicative proceedings "may not exclude evidence solely because it is hearsay," Utah Code Ann. § 63G-4-206(1)(c) (LexisNexis 2019), they nonetheless may not base a contested finding of fact "solely on hearsay evidence unless that evidence is admissible under the Utah Rules of Evidence," *id.* § 63G-4-208(3). This principle has come to be known as the residuum rule. *See Aura Spa & Boutique v. Department of Workforce Services*, 2017 UT App 152, ¶ 11, 402 P.3d 813.

¶61 Onysko alleges that eight of the Hearing Officer's findings of fact were "based exclusively on inadmissible hearsay," in violation of the residuum rule. We address each in turn.

### A. A Coworker Expressed Fear of Retaliation

¶62 First, Onysko argues that the Hearing Officer erroneously relied on the Investigation Report to find, in a footnote, that a

certain coworker "express[ed] concern that [Onysko] might retaliate against him for his participation in th[e] investigation" of Supervisor's abusive conduct complaint. Because that coworker never testified at the hearing, Onysko contends that this "finding" was solely based on the DHRM investigator's (Investigator) statement in the Investigation Report. But this first "finding" that allegedly violates the residuum rule is not, as Onysko contends, a finding of fact.

¶63    As an initial matter, it does not appear in the "Findings of Fact" section of the CSRO Decision. Instead, it is in the "Subsidiary and Procedural Issues" section in the context of discussing a procedural matter that arose during the hearing: Onysko's motion to compel the attendance and testimony of the coworker. The Hearing Officer denied this motion on the sixth day of the hearing on the ground that, in addition to the anticipated testimony being cumulative and immaterial, the coworker's "testimony would likely be unreliable." And the footnote's purpose was to explain the Hearing Officer's determination that the testimony would likely prove unreliable. Specifically, the footnote states that the coworker "sent an email to the [CSRO] requesting that he not be called to testify as he believed [Onysko] would retaliate against him if his testimony was unfavorable." The footnote then expressly stated that the "email is not evidence and the Hearing Officer did not consider [the] email in deciding this case."

¶64    The footnote also added that the coworker "is recorded [in the Investigation Report] as expressing concern that [Onysko] might retaliate against him for his participation in that investigation." This sentence forms the basis of Onysko's allegation of error. But the remainder of the CSRO Decision makes no mention whatsoever of the coworker or of his fear of retaliation by Onysko. It played no role in the CSRO Decision's ultimate affirmance of DEQ's decision to dismiss Onysko. Accordingly, we conclude the CSRO Decision's mention that the Investigation Report indicated that the coworker feared

retaliation was limited simply to the context of the procedural matter of Onysko's motion to compel and does not amount to a finding of fact, much less one based only on inadmissible hearsay.

B.     Onysko Left His GRAMA Requests on Supervisor's Desk

¶65     Second, Onysko alleges that the Hearing Officer erroneously found that he left copies of GRAMA requests on Supervisor's desk because the "finding was based exclusively on [Investigator's] testimony about what [Supervisor] supposedly told him." Although Supervisor testified at the hearing, neither Onysko nor DEQ asked her whether Onysko left the GRAMA requests on her desk.[25] But even assuming, without deciding, that this finding was solely based on hearsay, Onysko was not "substantially prejudiced" by the error. *See* Utah Code Ann. § 63G-4-403(4) (LexisNexis 2019).

¶66     "A party has been substantially prejudiced if the alleged error was not harmless." *Utah Office of Consumer Services v. Public Service Comm'n*, 2019 UT 26, ¶ 17, 445 P.3d 464 (quotation simplified). An error is "harmless if it is sufficiently inconsequential that there is no reasonable likelihood that the error affected the outcome of the proceedings." *Smith v. Department of Workforce Services*, 2010 UT App 382, ¶ 17, 245 P.3d 758 (quotation simplified).

---

25. Curiously, in its written "Closing Argument," without reference to Supervisor's testimony, DEQ stated that Supervisor "did not recall [Onysko] placing a copy of the request on her desk." And in his motion for a mistrial, Onysko argued that "[t]his eleventh hour revelation by [DEQ's] Counsel is shocking," warranting a mistrial. It is unclear on what DEQ based this comment. It appears to be a mistake rather than a considered concession.

¶67 Here, the CSRO Decision includes the finding that Onysko "did inform [Supervisor] that the GRAMA requests were filed, and it is more likely than not that he did so by leaving a copy of the requests on her desk." But it was based on "the unnecessary notification of [Supervisor]" of his GRAMA requests that the Hearing Officer concluded that Onysko "intended to [and did] cause [Supervisor] 'intimidation, humiliation, or unwarranted distress,'" thereby supporting, by substantial evidence, that Onysko's "conduct constituted abusive conduct." In other words, it was the unnecessary notification of Supervisor—not the manner of the notification—on which the Hearing Officer based his conclusion that Onysko had engaged in abusive conduct toward Supervisor. And the conclusion that Onysko unnecessarily notified Supervisor of his GRAMA requests *is* supported by, at the very least, a residuum of non-hearsay evidence.

¶68 Specifically, because Supervisor amended her abusive conduct complaint against Onysko on February 15, 2017, to include his filing of GRAMA requests, the Hearing Officer concluded that she must have known "no later than at least February 15, 2017, that [Onysko] had filed the GRAMA records requests." And because "normal procedures would not have required that [Supervisor] be notified of the request at all," the Hearing Officer inferred, with our emphasis, "that [Onysko] notified [Supervisor], *in one way or another*, that the requests had been filed."[26] For this reason, even if the Hearing Officer

---

26. The Hearing Officer also relied on Supervisor's testimony that Onysko's "conduct towards her between September and December 2016 was 'hostile'" and Onysko's "history of filing, or threatening to file, actions against individuals with whom he disagreed or against their professional licenses." The latter is the subject of Onysko's third allegation of a residuum rule violation. *See* Section IV(C).

erroneously found that the manner in which Onysko unnecessarily notified Supervisor of the GRAMA requests was to leave copies of the requests on Supervisor's desk, such error was "sufficiently inconsequential" to render it harmless. *Smith*, 2010 UT App 382, ¶ 17 (quotation simplified).

C.    Onysko's History of Filing or Threatening to File Complaints

¶69    Third, Onysko asserts that the Hearing Officer "erred in making findings about a 'history' of filings against many 'individuals with whom [Onysko] disagreed' based only on a singular filing that may have been entirely appropriate." He argues that because Supervisor was the only witness to testify "regarding . . . Onysko's filing of a DOPL complaint and no evidence was introduced as to the propriety of that complaint," "[t]he only evidence of other complaints was hearsay without detail."

¶70    But in making this argument, Onysko overlooks several other complaints he made, concerning which the Hearing Officer received evidence, that support the finding that he had a history of filing or threatening to file complaints against others. For example, (1) DHRM Representative testified that Onysko "told [her] that he had filed a criminal complaint against [her] for the way that the [Intent to Reprimand] . . . was given to [him]"; (2) in his written proffer to the Hearing Officer, Onysko acknowledged that he filed an OSHA complaint against DEQ, which OSHA ultimately dismissed as unmeritorious; (3) Onysko filed an abusive conduct complaint against Supervisor, which was also quickly dismissed; and (4) Onysko's written responses to Supervisor's need-for-improvement comment could reasonably be perceived as threatening.[27] We therefore reject Onysko's

27. Additionally, the Hearing Officer personally observed Onysko threaten to file a complaint with the Utah State Bar
(continued…)

contention that "[t]he only evidence of other complaints was hearsay without detail."

D.     The Effect of Onysko's Conduct on Coworkers and DEQ Customers

¶71     Onysko's final five arguments all relate to findings the Hearing Officer relied on in determining that "[s]ubstantial evidence supports the conclusion that [Onysko's] conduct adversely affected [DEQ] customers, productivity, and morale":

> 1.     He contends that the Hearing Officer erred in relying on Executive Director's "testimony that he received complaints about . . . Onysko from 'two DEQ customers' and 'several staff members.'" Because "no such customers[28] or staff members testified about submitted complaints," Onysko asserts Executive Director "acted as a conduit to relay customers' and staff members' personal knowledge."

---

(…continued)

against DEQ's counsel in response to counsel's statement in a motion to compel that Onysko requested a stay of discovery "in part to avoid responding to the discovery requests," which the Hearing Officer considered "a reasonable interpretation of the circumstances and unremarkable in argument to a motion to compel." And the Hearing Officer observed that Onysko continued "to allege professional misconduct and untruthfulness by [DEQ's] counsel throughout [the] proceeding."

28. Onysko is incorrect in this regard. At least one DEQ customer testified regarding a letter of complaint he submitted to DEQ.

2. He assails the finding that "[o]ther DDW engineers were 'on guard' against [Onysko] and regularly took extra time to over-document their work, which resulted in a loss of productivity." He asserts that because "none of [the] supposedly 'on guard' engineers testified," and because "this finding was based solely on [Supervisor's] testimony," the Hearing Officer "erred in making findings about the mental state of other DEQ engineers of which [Supervisor] had no personal knowledge."

3. He argues that the Hearing Officer erroneously found that Onysko's "[c]oworkers were concerned that they would be the next target of [Onysko's] allegations of unprofessional conduct or violation of the professional engineers' code of ethics," because "this testimony was offered by [Supervisor] who had no personal knowledge of the mental states of other DEQ coworkers."

4. He asserts the Hearing Officer erred in finding that his "demeanor and conduct made it difficult for coworkers or customers to work collaboratively with him," because "none of these alleged coworkers and customers testified." Instead, the director of DDW, "act[ing] as a conduit to relay those workers' and customers' personal knowledge," testified to this fact.

5. He alleges the Hearing Officer erred in relying on Executive Director's testimony "that morale was low" because "not a single witness testified that his or her morale was low" as a result of Onysko's conduct and Executive Director therefore "acted as a conduit to relay the personal knowledge of others."

¶72    But even assuming that the above-challenged findings of fact are based solely on the testimonies of Executive Director, Supervisor, and the director of DDW, as Onysko asserts, his argument necessarily fails because he has not met his burden of persuasion in this proceeding for judicial review. Specifically, Onysko's argument is devoid of any meaningful analysis as to whether the evidence upon which the challenged findings are allegedly based is truly hearsay, and if so, inadmissible hearsay.

¶73    The relevant inquiries when determining if certain evidence constitutes hearsay are whether (1) the challenged evidence is a statement (2) by an out-of-court declarant (3) that is offered "to prove the truth of the matter asserted." Utah R. Evid. 801(c). Onysko does not address any of these factors when challenging the witnesses' testimony on hearsay grounds. Rather, he bases his claim of hearsay solely on the ground that the witnesses allegedly lacked personal knowledge of the subjects to which they testified. But this argument invokes rule 602 of the Utah Rules of Evidence and not rule 801,[29] *see id.* R. 602

---

29. Onysko quotes *State v. McNeil*, 2013 UT App 134, 302 P.3d 844, *aff'd*, 2016 UT 3, 365 P.3d 699, for the proposition that "hearsay is generally inadmissible because the witness is acting as a conduit to relay the personal knowledge or observations of others." *Id.* ¶ 44 (quotation simplified). But the language quoted does not define hearsay or discuss the inquiry courts engage in

(continued…)

(stating that a fact witness "may testify to a matter only if . . . the witness has personal knowledge of the matter"), and rule 602 is immaterial in the residuum-rule context.

¶74  Without the benefit of focused analysis on whether the evidentiary bases of the challenged findings constitute inadmissible hearsay, we decline to further address these challenges. *See* Utah R. App. P. 24(a)(8) (requiring a party on appeal to "explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal"); *Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903.

CONCLUSION

¶75  We conclude that the Hearing Officer did not (1) exceed his discretion in using his experience and observations of Onysko's conduct during the course of the extensive seven-day hearing as corroborative of the testimonies of DEQ's witnesses, (2) violate due process in considering certain evidence, or (3) violate the residuum rule in making various findings. Accordingly, we decline to disturb the CSRO Decision.

––––––––––

(…continued)
when making hearsay determinations. Rather, it merely expresses one of the reasons *why* "[h]earsay is generally inadmissible." *Id.*