2023 UT App 58

## THE UTAH COURT OF APPEALS

FRIENDS OF GREAT SALT LAKE,
Petitioner,

*v.*

DEPARTMENT OF ENVIRONMENTAL QUALITY,
DIVISION OF WASTE MANAGEMENT AND RADIATION CONTROL,
AND PROMONTORY POINT RESOURCES LLC,
Respondents.

Opinion
No. 20210589-CA
Filed May 25, 2023

Original Proceeding in this Court

Charles R. Dubuc Jr., Attorney for Petitioner

Sean D. Reyes, Andrew Dymek, and
Raymond Wixom, Attorneys for State Respondents

Bradley R. Cahoon, Lyndon R. Bradshaw, and
Tyler R. Cahoon,
Attorneys for Promontory Point Resources LLC

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred.

ORME, Judge:

¶1 Soon after purchasing a landfill near the Great Salt Lake, Promontory Point Resources LLC (PPR) sought to relocate a landfill cell, which required a permit modification. The Director of the Division of Waste Management and Radiation Control (the Division) approved the modification. Because the cell's relocation caused the landfill's existing groundwater monitoring system to no longer be compliant with regulatory requirements, PPR then sought to again modify the permit to install four new monitoring wells—one upgradient and three downgradient from the new

cell. During the public comment period, Friends of Great Salt Lake (Friends) and other entities raised concerns that the proposed groundwater monitoring system would be insufficient to detect leakage from the cell to the Great Salt Lake.

¶2     The Director eventually approved PPR's requested permit modification, and Friends subsequently petitioned the Executive Director of the Department of Environmental Quality (DEQ) to review the approval. The Executive Director ultimately issued a final order affirming the permit modification approval, and Friends now seeks judicial review of the final order. Because neither of the alleged errors Friends raises in its petition for review resulted in substantial prejudice, we decline to disturb the Executive Director's final order.

BACKGROUND

¶3     PPR holds a DEQ-issued permit to operate a landfill that is located on the Promontory Peninsula of the Great Salt Lake. The initial permit for the landfill was issued to a prior owner in 2004 and was renewed in 2011. PPR acquired the landfill in 2015 and became the permittee in 2016. Also in 2016, PPR sought to modify the permit "to change the location and design of what is now Cell 1A,"[1] which modification the Director approved in March 2017. Construction of Cell 1A was completed in December 2017.

¶4     Because the two existing downgradient monitoring wells—which had formed part of the landfill's groundwater monitoring system—were not within 500 feet of Cell 1A's new

---

1. DEQ explains that a "cell" is "a discrete volume (e.g., pit) with a liner for storing waste."

location, as is required by regulation,[2] PPR filed a request with the Division in October 2017 to modify its groundwater monitoring system. The requested modification involved the installation of three new downgradient monitoring wells within 500 feet of Cell 1A, as well as one new upgradient well.

¶5      The Director conducted a public comment period on the requested permit modification in January and February 2018. Friends[3] and other concerned entities submitted comments suggesting that the new groundwater monitoring system was inadequate to detect landfill contamination that might reach the Great Salt Lake. Among other things, they expressed concern that the new system insufficiently addressed the fractured bedrock beneath Cell 1A, "which creates natural pathways for leachate and associated toxins to contaminate groundwater and for that contamination to spread" to the Great Salt Lake. In support of the claim that the bedrock beneath Cell 1A was fractured, Friends

---

2. Rule R315-308-2(2) of the Utah Administrative Code provides,

> The ground water monitoring system must consist of at least one background or upgradient well and two downgradient wells, installed at appropriate locations and depths to yield ground water samples from the uppermost aquifer and all hydraulically connected aquifers below the facility, cell, or unit. The downgradient wells shall be designated as the point of compliance and must be installed at the closest practicable distance hydraulically down gradient from the unit boundary not to exceed 150 meters (500 feet) and must also be on the property of the owner or operator[.]

3. According to its public comment, Friends "is a non-profit organization that has, as its mission, the preservation and protection of the Great Salt Lake ecosystem as well as Great Salt Lake's watershed."

relied on two prior studies conducted at the landfill: (1) a 2002 "geotechnical/geologic study" conducted by Applied Geotechnical Engineering Consultants, Inc. (AGEC) and (2) a 2015–2016 study conducted by Tetra Tech BAS (Tetra Tech) that "included a review of the available data as well as an initial field investigation and associated laboratory evaluation" and also included a geotechnical engineering report.

¶6    PPR installed the four new monitoring wells in October 2018. In December, the Director invited PPR to submit reply comments. In support of its position, PPR submitted, among other things, a 287-page hydrogeologic study prepared in 2018 by Loughlin Water Associates LLC (Loughlin) that summarized "the findings of a hydrogeologic assessment . . . which included the drilling, construction and testing of [the] four new monitoring wells." As part of this, the Loughlin study analyzed core samples that were drilled at each of the new well locations, ranging in depth from 101 to 149 feet. None of the core samples revealed bedrock—much less fractured bedrock—as Friends claimed. Instead, the core samples "indicate[d] that Lake Bonneville[4] deposits range in thickness from 20 to 30 feet and overlie an extensive semi-consolidated to consolidated fanglomerate

---

4. "Today's Great Salt Lake is a shallow, salty remnant of ancient Lake Bonneville." *Great Salt Lake & Lake Bonneville*, Utah Geological Survey, https://geology.utah.gov/popular/great-salt-lake [https://perma.cc/F553-LB7F]. Although prehistoric Lake Bonneville was a freshwater lake, "[m]uch of the salt now contained in Great Salt Lake was originally in the water of Lake Bonneville." *Id.* "Other relics of Lake Bonneville are Utah Lake, Sevier Lake, and the Great Salt Lake Desert which contains the famous Bonneville Salt Flats." *Id.*

deposit,"[5] "which is uniform and unfractured and contains substantial amounts of silt and clay." In sum, the Loughlin study concluded that "[t]he landfill and the aquifer beneath the landfill are within an unfractured, low permeability[6] fanglomerate deposit."

¶7 The Loughlin study also reviewed the AGEC and Tetra Tech studies and disagreed with some of their observations and conclusions. The Loughlin study stated that the drilling equipment used in both studies was not sufficient to drill through bedrock and disagreed that the bedrock—which it concluded was located at least 149 feet below the surface—was highly fractured. The Loughlin study suggested that "[t]he fanglomerate deposit may have been identified in previous site investigations as 'weathered bedrock.'"[7]

---

5. Fanglomerate is "[a] sedimentary rock of heterogenous materials that were originally deposited in an alluvial fan and have since become cemented into solid rock." *Fanglomerate*, Dictionary of Geological Terms 178 (Robert L. Bates & Julia A. Jackson eds., 3d ed. 1984).

6. Permeability is "[t]he capacity of a porous rock, sediment, or soil for transmitting a fluid; it is a measure of the relative ease of fluid flow under unequal pressure." *Permeability*, Dictionary of Geological Terms 377 (Robert L. Bates & Julia A. Jackson eds., 3d ed. 1984).

7. In response to a subsequent question from the Division, Loughlin explained that although intensely fractured bedrock can be observed at the surface around the landfill, it did not reflect subsurface conditions. It stated that "much of the fracturing seen in the bedrock at the surface is the result of a freeze-thaw action induced by Lake Bonneville on the shoreline, which is

(continued…)

¶8 In April and May 2019, the Division submitted several questions to PPR regarding the Loughlin study. In relevant part, the Division asked PPR to demonstrate that the three new downgradient wells had a 95 percent detection rate. The Division suggested that PPR could achieve this through a certain form of modeling. PPR responded that "[n]either modeling of well placements nor a 95 percent detection rate at the landfill is required by [Utah Administrative Code rule] R315-308 or any other law or regulation." The Division subsequently sent PPR a letter in which it "agree[d] that groundwater modeling is not required by the Rule" but noted that "a groundwater flow and transport model, built on the basis of the interface of the hydrogeologic components listed in [federal regulations], could help ensure appropriate well spacing and the number of wells needed to detect potential releases." Loughlin responded by letter on PPR's behalf stating that "(i) there are no rules governing a modeling approach; (ii) modeling would require a number of assumptions with no regulatory basis; (iii) there is not enough data to calibrate the modeling; and (iv) running the model under different scenarios would be extremely burdensome." The Division offered no pushback to this response.

---

characterized by random surface fracturing and a lack of conjugate joint sets." Loughlin further pointed to a pilot hole that had been drilled for an onsite production well, which was constructed to provide water for landfill operations. The pilot hole first "identified bedrock at a depth of about 168 feet." Regarding this bedrock, the Loughlin study further concluded that

> (1) the quartzite bedrock penetrated by the PPR Production Well is relatively unfractured, and that the fractures that are present have been filled by gypsum and clay, (2) this formation is of extremely low permeability, and (3) the gradient from the bedrock is upward because the aquifer is under confined conditions.

¶9 The Director also invited those who had previously provided public comment "to submit surreply comments to PPR's reply comments." Friends submitted a review that raised concerns about the sufficiency of the Loughlin study.

¶10 In July 2019, the Director approved PPR's request to modify its permit. In so doing, the Director stated that he "believes these wells are sufficient to show background water conditions and to detect releases from the landfill." The Director further stated that "[a]lthough the Division did suggest development of a groundwater model to determine the number of downgradient wells, it was concluded that some input parameters were ill-defined, so that a specific inference from a groundwater model would be too subjective to be useful in making a decision."

¶11 Friends filed a petition for review with the Executive Director and later requested that an administrative law judge be appointed in the matter. The Executive Director approved the request and appointed an administrative law judge (the ALJ) to conduct a permit review adjudicative proceeding. *See* Utah Code Ann. § 19-1-301.5(5)(a) (LexisNexis 2019). In its brief to the ALJ, Friends made, among others, the following two arguments. First, Friends contended that the ALJ should review the Director's approval of the permit modification under a "substantial evidence" standard instead of a "clearly erroneous" standard. Second, Friends challenged the Director's finding that it was unlikely that there were any hydraulically connected aquifers below Cell 1A, which satisfied the regulatory requirement that, with our emphasis, Cell 1A's groundwater monitoring system be "installed at appropriate locations and depths to yield groundwater samples from the uppermost aquifer and *all hydraulically connected* aquifers below" Cell 1A. *See* Utah Admin. Code R315-308-2(2). The Director based this finding on the boring log information documented in the Loughlin study and the lack of strong evidence indicating otherwise.

¶12    In making this second challenge, Friends raised what has come to be known in this matter as "the Geertsen claim." Under the Geertsen claim, Friends argued that the Tetra Tech study showed "the stacking of formations from top to bottom as: Alluvium/Geertsen Canyon Quartzite/Browns Hole Formation/Mutual Formation." But because the Loughlin study showed only a stacking of "Alluvium/Fanglomerate/?/?," Friends asserted that "we are left to assume that PPR has substituted fanglomerate for the Geertsen Canyon Formation, and that therefore directly below the fanglomerate/Geertsen Canyon formation lies the Browns Hole formation," which the Tetra Tech study described as "highly- to intensely-fractured/jointed." Accordingly, as summarized by the ALJ, Friends argued that "[b]ased on record evidence," the only conclusions the Director could have properly reached were:

> (1) the Geertsen Canyon Quartzite bedrock formation is the same as what PPR has described as the fanglomerate layer;
>
> (2) directly below the fanglomerate/Geertsen Canyon Quartzite bedrock formation containing the shallow aquifer at the landfill site lies the highly-fractured, largely uncemented Browns Hole Formation;
>
> (3) there must be a hydraulic connection between the Browns Hole Formation and the fanglomerate/Geertsen Canyon Quartzite bedrock formation containing the shallow aquifer directly above it;
>
> (4) because of the hydraulic connection between the two formations, the Browns Hole Formation must be considered to be part of the uppermost aquifer and the Director must require PPR to monitor that

formation as well as, possibly, the Mutual Formation that lies directly below the Browns Hole Formation; and

(5) because PPR's current monitoring wells do not monitor the Browns Hole Formation, the Director should have found that PPR's monitoring system is deficient.

¶13 In opposition, the Director primarily argued that (1) the clear error standard of review—and not the substantial evidence standard—should be applied to the decision to approve the permit modification and (2) the Geertsen claim was untimely. Concerning the latter argument, the Director asserted that the Geertsen claim was untimely because (a) it was not raised during the public comment period, as required by Utah law, *see* Utah Code Ann. § 19-1-301.5(4)(a) ("If a public comment period was provided during the permit application process . . . , a person who challenges an order or determination may only raise an issue or argument during the special adjudicative proceeding that . . . the person raised during the public comment period[.]") and (b) Friends raised it for the first time in its brief and did not include it in its petition for review, in contravention of the applicable rule, *see* Utah Admin. Code R305-7-213(1)(f) ("Matters not raised in the petition may not be raised in the opening brief."). Additionally, the Director disputed the Geertsen claim on the merits, pointing to the Loughlin study in support of the conclusion that the fanglomerate is unfractured.

¶14 Following the adjudicative proceeding, the ALJ issued a "Statement of Material Facts, Conclusions of Law and Recommended Order on the Merits." In relevant part, the ALJ concluded that "the standard of review for the Director's factual determinations in this special adjudicative proceeding is the clearly erroneous standard, as prescribed in Utah Code § 19-1-301.5(14)(b), and that the substantial evidence standard of

Subsection 63G-4-403(4)(g) does not apply to special adjudicative proceedings under Utah Code § 19-1-301.5."

¶15    Concerning the Geertsen claim, the ALJ first rejected the Director's comment-period timeliness argument on the ground that the Geertsen claim "was not reasonably ascertainable before or during the public comment period." *See* Utah Code Ann. § 19-1-301.5(6)(e)(ii). But the ALJ agreed that the Geertsen claim was untimely because Friends had not raised the issue in its petition for review and had raised it for the first time during briefing. Accordingly, the ALJ recommended dismissal of the Geertsen claim, with prejudice.

¶16    Nevertheless, despite concluding that the Geertsen claim was untimely, the ALJ held that "[t]he Director did not err in determining that the bedrock beneath the landfill is cemented and [that] there is no hydraulic connection between the shallow aquifer and bedrock." The ALJ noted that "the Director determined, based on information in the Loughlin study, Loughlin's responses to the Director's comments, and the Director's expertise, that it is unlikely there is flow from the alluvium ([fanglomerate] aquifer) at the landfill into the bedrock" and "that there is no site-specific evidence of bedrock fracturing." The ALJ then stated, "Friends raises issues and makes speculative and general statements, but does not offer persuasive, specific evidence of a hydraulic connection between the shallow ([fanglomerate]) aquifer and the bedrock."[8] Accordingly, the ALJ

---

8. The ALJ noted that "the Loughlin Study disagrees with the [Tetra Tech] and AGEC[] studies['] observations and conclusions, stating that they did not use drilling equipment sufficient to drill through bedrock in test pits or monitoring wells (except [monitoring well 5]) and that statements that the bedrock was highly fractured are inaccurate" based on core samples. Additionally, the Loughlin study opined that the highly fractured

(continued…)

held that the Director did not clearly err in determining "that the bedrock beneath the landfill is cemented and there is no hydraulic connection between the shallow aquifer and the bedrock."

¶17 The ALJ also concluded that "[t]he Director's determination that the three downgradient monitoring wells are sufficient to detect any releases from the landfill is a factual, technical, and scientific determination that is supported by the record." Specifically, the ALJ pointed to, among other things, the Director's following statements:

- "The upgradient and downgradient wells appear to monitor the same hydrologic unit (fanglomerate), as evident from the boring logs presented in the [Loughlin study]."

- "Although the Division did suggest development of a groundwater model to determine the number of downgradient wells, it was concluded that some input parameters were ill-defined, so that a specific inference from a groundwater model would be too subjective to be useful in making a decision."

- "The [Loughlin study] provides evidence that groundwater samples taken from the monitoring wells are representative of the aquifer condition below the landfill."

The ALJ also pointed to the following information from the Loughlin study and Loughlin's responses to the Division's questions in support of the Director's conclusion that the three downgradient monitoring wells were sufficient to detect contamination:

surface bedrock referred to in the other studies was limestone bedrock, which was not detected underneath the surface.

- "[T]he spacing of the three downgradient wells is appropriate, given the low particle velocities in the fanglomerate aquifer beneath the landfill."

- "The hydrogeologic characteristics of the landfill area have been defined and show that the wells meet the requirements of R315-308."

- "The groundwater gradient and flow direction beneath the cell is south-southwest, as demonstrated by groundwater level measurements obtained between October 2018 and May 2019. Measurements obtained show [the three downgradient wells] are downgradient of the cell. Variations in groundwater levels and flow direction occur, but [the three downgradient wells] continue to be downgradient. Additionally, [one of the three downgradient wells] is directly downgradient of the leachate collection sump, the lowest collection point for the landfill drainage net and, therefore, is the most probable location for detection of a potential release."

Finally, the ALJ stated that Friends "does not offer persuasive, specific evidence of fractured bedrock, complex geology, or that the wells will not detect any potential releases from the landfill."

¶18 Following further comments from the parties, the Executive Director issued a written "Final Order Adopting Recommended Decision Dismissing Adjudicative Proceedings" in which the Executive Director agreed with and adopted the ALJ's "Findings of Fact, Conclusions of Law, and Recommended Order as written." In relevant part, the Executive Director adopted the following findings and conclusions of the ALJ:

- "Since Friends failed to preserve its claim that Fanglomerate is the Geertsen Canyon Formation, this claim is dismissed, with prejudice."

- "The Director did not err in determining that the Monitoring Well System complies with Utah Administrative Code R315-308-2 and that [PPR] was not required to conduct modeling."

- "The Director did not err in issuing the permit modification."

- "The Director did not err in determining that the bedrock beneath the landfill is cemented and there is no hydraulic connection between the shallow aquifer and bedrock."

- "The Director did not err in determining that the three downgradient monitoring wells are sufficient to detect any releases from Cell 1A."

¶19 Friends now seeks judicial review of the Executive Director's final order.

ISSUES AND STANDARDS OF REVIEW

¶20 Our review of the Executive Director's final order is governed by the Utah Administrative Procedures Act (UAPA). *See* Utah Code Ann. § 19-1-301.5(16)(c)(i) (LexisNexis 2019) ("During judicial review of a dispositive action, the appellate court shall . . . review all agency determinations in accordance with Subsection 63G-4-403(4)[.]"); *id.* § 19-1-301.5(16)(a). *See also Utah Physicians for a Healthy Env't v. Executive Dir. of the Utah Dep't of Env't Quality*, 2016 UT 49, ¶ 12, 391 P.3d 148 ("Our authority to review final agency adjudications is set forth in part 4 of [UAPA]."). Under UAPA, an appellate court may grant relief only if a petitioner establishes (1) the existence of an error enumerated in section 63G-4-403(4) and (2) that the error "substantially prejudiced" the petitioner. *See* Utah Code Ann. § 63G-4-403(4) (LexisNexis 2019); *Onysko v. Department of Env't*

*Quality*, 2020 UT App 51, ¶ 31, 463 P.3d 669, *cert. denied*, 466 P.3d 1072 (Utah 2020).

¶21 Under the first prong, "unless section 63G-4-403(4) incorporates a specific standard of review" for an enumerated error, "we are free to apply our traditional approach for selecting an appropriate standard of review, depending on whether the agency action can be characterized as a question of law, a question of fact, or a mixed question of law and fact." *Onysko*, 2020 UT App 51, ¶ 31 (quotation simplified). Additionally, we are required to "uphold all factual, technical, and scientific agency determinations that are not clearly erroneous based upon the petitioner's marshaling of the evidence." Utah Code Ann. § 19-1-301.5(16)(c)(ii).

¶22 Under the second prong, "a party has been substantially prejudiced if the alleged error was not harmless." *Onysko*, 2020 UT App 51, ¶ 66 (quotation simplified). And "an error is harmless if it is sufficiently inconsequential that there is no reasonable likelihood that the error affected the outcome of the proceedings." *Id.* (quotation simplified).

¶23 Here, Friends first argues the Executive Director and the ALJ[9] erred in holding that the appellate standards of review provided for under section 63G-4-403(4) of the Utah Code did not apply to their review of the Director's permit modification decision. Second, Friends argues the Executive Director erred in holding, based on rule R305-7-213(1)(f) of the Utah Administrative Code, that the Geertsen claim was untimely and

---

9. When the Executive Director adopts an administrative law judge's recommended final order, the conclusions and analyses become part of the Executive Director's final, appealable order. *See Living Rivers v. Executive Dir. of the Utah Dep't of Env't Quality*, 2017 UT 64, ¶ 35, 417 P.3d 57.

in dismissing it on that ground.[10] Both issues present questions of law and therefore fall within the ambit of section 63G-4-403(4)(d) of the Utah Code, which states that an appellate court shall grant relief if "the agency has erroneously interpreted or applied the law" and such error resulted in substantial prejudice. DEQ, by statute, "has been granted substantial discretion to interpret its governing statutes and rules." *See* Utah Code Ann. § 19-1-301.5(16)(c)(i). But "this grant of authority does not turn an agency's application or interpretation of the law into the type of action that would warrant an abuse of discretion standard." *Sevier Citizens for Clean Air & Water, Inc. v. Department of Env't Quality*, 2014 UT App 257, ¶ 5, 338 P.3d 831 (quotation simplified). "Rather, we apply our traditional approach in selecting the appropriate standard of review based on whether [DEQ's] decision qualifies as a finding of fact, a conclusion of law, or a determination of a mixed question of law and fact." *Id.* (quotation simplified). *See Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 21, 308 P.3d 461 (stating that because section 63G-4-404(4)(d) "does not imply a standard of review," "we are free to apply our traditional approach for selecting an appropriate standard of review").

---

10. Both DEQ and PPR assert that Friends did not preserve this issue for review "because Friends didn't oppose the Director's argument to the ALJ that Rule 305-7-213(1)(f) mandated dismissal of the Geertsen Claim." But because we resolve this issue on the merits in DEQ's and PPR's favor, we need not address their preservation argument. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("If the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation.") (quotation simplified), *cert. denied*, 496 P.3d 718 (Utah 2021).

ANALYSIS

I. UAPA Standards of Review

¶24  Section 19-1-301.5, a provision of Utah's statutory Environmental Quality Code, "governs special adjudicative proceedings," Utah Code Ann. § 19-1-301.5(2) (LexisNexis 2019), which it defines, in relevant part, as "proceeding[s] under this section to resolve a challenge to a . . . permit order," *id.* § 19-1-301.5(1)(g)(i). Friends argues that, under this statute, the Executive Director and the ALJ erred in not applying the appellate standards of review provided for in UAPA's section 63G-4-403(4). *See id.* § 19-1-301.5(16)(c)(i) ("During judicial review of a dispositive action, the appellate court shall . . . review all agency determinations in accordance with Subsection 63G-4-403(4), recognizing that the agency has been granted substantial discretion to interpret its governing statutes and rules[.]"). Although section 19-1-301.5(16)(c)(i) is expressly limited to "*judicial* review of a *dispositive action*,"[11] *id.* (emphases added), and although, with a few limited exceptions, UAPA does not apply to permit review adjudicative proceedings, *see id.* § 19-1-301.5(3), Friends contends that section 19-1-301.5(16)(c)(i) nonetheless extends to such proceedings by virtue of "DEQ's precedent and prior practice" that "require the ALJ and Executive Director to function as appellate reviewers."[12] Accordingly, Friends asserts

_____

11. A "[d]ispositive action" is defined as "a final agency action that (i) the executive director takes as part of a special adjudicative proceeding; and (ii) is subject to judicial review." Utah Code Ann. § 19-1-301.5(1)(a) (LexisNexis 2019).

12. In support of its contention that it is the established precedent of DEQ for administrative law judges and the Executive Director to apply UAPA appellate standards in permit review adjudicative proceedings, Friends cites several prior DEQ orders dating back

(continued…)

that in light of DEQ's established precedent, the Executive Director and the ALJ did "not have the discretion to ignore the clear mandate imposed by the Legislature" to apply the appellate standards under UAPA section 63G-4-403(4) to their review of the Director's decision.[13] *See Salt Lake Citizens Cong. v. Mountain States Tel. & Tel. Co.*, 846 P.2d 1245, 1253 (Utah 1992) ("Rules of law developed in the context of agency adjudication are as binding as

---

to 2014 and 2015, including an order in which the then-Executive Director stated, "I am bound by the same standard of review as the appellate court concerning factual determinations." We note, however, that our Legislature has since amended section 19-1-301.5 to require the Executive Director and appellate courts to review "factual, technical, and scientific agency determinations" for clear error, instead of for substantial evidence, as had been the case at the time the cited orders were issued. *Compare* Utah Code Ann. § 19-1-301.5(13)(b), (14)(c)(ii) (LexisNexis 2013), *with id.* § 19-1-301.5(14)(b), (16)(c)(ii) (2019). Under UAPA's section 63G-4-403(4)(g), appellate courts are required to review factual findings for substantial evidence.

13. Alternatively, Friends argues that "[e]ven if DEQ's precedent does not have the force and effect of a rule, the Executive Director's decision that appellate standards of review no longer apply to special adjudicative proceedings is contrary to DEQ's prior practice, in violation of Subsection 63G-4-403(4)(h)(iii)." *See* Utah Code Ann. § 63G-4-403(4)(h)(iii) (LexisNexis 2019) (stating that a petitioner may be entitled to relief if "the agency action is . . . contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency"). Because we hold that Friends was not substantially prejudiced by the Executive Director's alleged failure to review the Director's findings for substantial evidence, this argument also necessarily fails.

those promulgated by agency rule making. Thus, rules of law established by adjudication apply to the future conduct of all persons subject to the jurisdiction of an administrative agency, unless and until expressly altered by statute, rule, or agency decision.") (citation omitted).

¶25 Although Friends generally references the various standards of review provided under UAPA section 63G-4-403(4) in its argument, its claim of error is limited to challenging the Executive Director's decision not to set aside the Director's findings that supported his approval of PPR's requested permit modification. Specifically, Friends contends that "the Director offered no record evidence in support of his decision not to require PPR to demonstrate that its monitoring system would adequately detect potential leaks" and in support of the Director's "disregard of the Division's statements that three wells were not enough given the size of" Cell 1A. *See* Utah Code Ann. § 19-6-108(9)(b) (LexisNexis Supp. 2022) (stating that "the Director may not approve a . . . waste operation plan" without "evidence that the transfer, treatment, or disposal of nonhazardous solid waste or treatment, storage, or disposal of hazardous waste will not be done in a manner that may cause or significantly contribute to an increase in mortality, an increase in serious irreversible or incapacitating reversible illness, or pose a substantial present or potential hazard to human health or the environment"). In the absence of modeling—which Friends also argues the Director erroneously did not require—Friends asserts that "[t]he Director was obligated to require PPR to provide *some* demonstration that its system was sufficient to meet the legal requirements."[14] In sum, Friends argues that "[b]ecause the ALJ

---

14. Friends alternatively argues that we "should determine that the Director failed to meet the substantial evidence and clearly erroneous standards" because "[i]n his decision, the Director

(continued…)

and the Executive Director failed in their obligation to determine whether the Director's decision was supported by substantial evidence, the Executive Director's endorsement of the Director's decision was clearly erroneous." Accordingly, Friends' argument implicates only the ALJ's and the Executive Director's failure to conduct a review under UAPA section 63G-4-403(4)(g), which imposes the substantial evidence standard of review for findings of fact. *See Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶¶ 19–20, 308 P.3d 461.

¶26 We need not resolve the merits of Friends' argument. Even assuming, without deciding, that the ALJ and the Executive Director erred in not reviewing the Director's factual findings for substantial evidence, such error did not substantially prejudice Friends because the Director's factual findings withstood the ALJ's and the Executive Director's clear error review. *See generally*

---

offered no record evidence in support of his decision not to require PPR to demonstrate that its monitoring system would adequately detect potential leaks." But our review is not of the *Director's* decision, but of the *Executive Director's* final order. *See* Utah Code Ann. § 19-1-301.5(16)(a) (LexisNexis 2019) ("A party may seek judicial review in the Utah Court of Appeals of *a dispositive action* in a special adjudicative proceeding[.]") (emphasis added); *Utah Physicians for a Healthy Env't v. Executive Dir. of the Utah Dep't of Env't Quality*, 2016 UT 49, ¶ 17, 391 P.3d 148 (noting that a party may seek judicial review only of a dispositive agency action and, accordingly, "[t]o succeed on appeal, the Petitioners must take issue with and demonstrate error in a *final* agency action") (emphasis in original). Because Friends does not address the evidence discussed by the ALJ (whose recommended order the Executive Director adopted), *see supra* ¶ 17, much less marshal any evidence as part of its challenge, Friends has not carried its burden of persuasion on this issue. *See Utah Physicians*, 2016 UT 49, ¶¶ 19–20.

Utah Code Ann. § 63G-4-403(4) (stating that a petitioner is entitled to relief only if the petitioner "has been substantially prejudiced by" certain enumerated errors).

¶27     As discussed above, the ALJ reviewed the Director's factual findings for clear error.[15] Under that standard, a finding is clearly erroneous if it is "not *adequately* supported by the record, resolving all disputes in the evidence in a light most favorable to the [agency's] determination." *Salt Lake City Corp. v. Haik*, 2019 UT App 4, ¶ 43, 438 P.3d 913 (emphasis added) (quotation otherwise simplified), *aff'd*, 2020 UT 29, 466 P.3d 178. This standard is remarkably similar to the substantial evidence standard. That is, "substantial evidence is more than a mere scintilla of evidence though something less than the weight of the evidence, and the substantial evidence test is met when a reasonable mind might accept as *adequate* the evidence supporting the decision." *Onysko*

---

15. We note that even if Friends is correct that the Executive Director is governed, under prior agency precedent, by the same standards of review as appellate courts, the Executive Director would have nonetheless been required to review the challenged factual findings for clear error either in place of or in addition to the substantial evidence standard of section 63G-4-403(4)(g). Section 19-1-301.5(16)(c)(ii)—which also governs judicial review of a dispositive agency action under that chapter—requires appellate courts to "uphold all factual, technical, and scientific agency determinations that are not clearly erroneous based upon the petitioner's marshaling of the evidence." Utah Code Ann. § 19-1-301.5(16)(c)(ii) (LexisNexis 2019). Although we do not definitively decide how section 19-1-301.5(16)(c)(ii) of the Environmental Quality Code interacts with UAPA section 63G-4-403(4)(g)—which is made applicable to our review by virtue of section 19-1-301.5(16)(c)(i)—it is clear that the Executive Director would, in any event, have been required to review the factual determinations for clear error.

*v. Department of Env't Quality*, 2020 UT App 51, ¶ 34, 463 P.3d 669 (emphasis added) (quotation otherwise simplified), *cert. denied*, 466 P.3d 1072 (Utah 2020). *See EAGALA, Inc. v. Department of Workforce Services*, 2007 UT App 43, ¶ 8, 157 P.3d 334 (defining substantial evidence "as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (quotation simplified). Importantly, both standards require only that the findings of fact be adequately supported by the record, which affords significant deference to the agency's factual determinations. *See Sawyer v. Department of Workforce Services*, 2015 UT 33, ¶ 9, 345 P.3d 1253 (stating that the clearly erroneous standard of review is "highly deferential"); *Utah Chapter of the Sierra Club v. Board of Oil, Gas, & Mining*, 2012 UT 73, ¶ 24, 289 P.3d 558 (stating that under the substantial evidence standard, "we give great deference to the [agency's] factual findings"). Indeed, this court has, in prior decisions, held that satisfaction of the substantial evidence standard likewise satisfied the clear error standard. *See, e.g.*, *Hexcel Corp. v. Labor Comm'n*, 2022 UT App 52, ¶¶ 24, 42, 510 P.3d 310 (concluding that because the Labor Commission's factual determination was supported by substantial evidence, it was not clearly erroneous); *Deseret Book Co. v. Department of Workforce Services*, 2018 UT App 50, ¶ 8, 420 P.3d 109 ("To establish clear error, the challenging party must demonstrate that the [agency's] decision is not supported by substantial evidence when viewed in light of the whole record.") (quotation simplified).

¶28    One difference between the two standards is that under clear error review, all disputes in the evidence are resolved "in a light most favorable to the [agency's] determination." *Haik*, 2019 UT App 4, ¶ 43 (quotation simplified). But although the substantial evidence standard makes no mention of resolving conflicts of evidence in the light most favorable to an agency's finding, it is nonetheless "well recognized that when the evidence is disputed, we defer to the agency's assessment of credibility and

resolution of the conflicting evidence." *Onysko*, 2020 UT App 51, ¶ 33 (quotation simplified).

¶29 In any event, to the extent that the substantial evidence standard is less deferential than the clear error standard, we are not convinced that the difference is sufficient in this case to have reasonably likely altered the outcome of the proceeding in Friends' favor. *See id.* ¶ 66. Friends' claim of substantial prejudice is limited to the assertion that "[h]ad the Executive Director applied the correct standard of review, there was a reasonable likelihood of a more favorable outcome for Friends on that issue," which it does not support with any persuasive argument or analysis.[16] This is insufficient to convince us that Friends was substantially prejudiced by any alleged failure by the Executive Director to review the Director's factual findings for substantial evidence.

¶30 In conclusion, because the substantial evidence standard of review does not impose a materially greater burden than the clear error standard, it is not reasonably likely that the outcome of the proceedings would have been different had the Executive Director reviewed the challenged findings for substantial evidence under UAPA section 63G-4-403(4)(g).

---

16. In its reply brief, Friends asserts, without supporting legal authority, that "the very nature of the issues raised on appeal in this instance demonstrates *prima facie* evidence of substantial prejudice" because "[w]hen a party alleges that the incorrect standard of review was applied in the proceeding below, . . . there are no circumstances where the result of applying an incorrect standard would constitute harmless error." We disagree. As discussed above, failure to review a factual finding for substantial evidence where the finding was already reviewed for clear error presents, at least in this case, one such circumstance.

## II. The Geertsen Claim

¶31     Friends argues that the Executive Director erred in holding that the Geertsen claim was not timely under our administrative rules, which provide that "[m]atters not addressed in the petition may not be raised in the opening brief." *See* Utah Admin. Code R305-7-213(1)(f). Friends summarizes the Geertsen claim as the argument "that, based on the record evidence, the only defensible determination the Director could have made was that the aquifer was hydraulically connected from the fractured bedrock beneath it." Friends contends that "the Geertsen Claim is no claim at all; it is evidence demonstrating the Director's error in determining that hydraulic connectivity does not exist," which claim it *did* raise in its petition for review. And because "the administrative record did not exist until seven months after the petition was filed, presenting marshaled demonstrations of error could only be accomplished during the merits portion of the proceeding." Accordingly, Friends argues that it was "clearly erroneous for the Executive Director to classify the Geertsen Claim as a separate 'matter' and then dismiss that matter pursuant to Rule 305-7-213(1)(f)."

¶32     We need not resolve whether the Executive Director properly characterized the Geertsen claim as a separate matter, and if she did not, whether this amounted to a misapplication of the administrative rule. Friends' argument suffers from the same flaw as its prior argument—Friends has not carried its burden of persuasion in establishing that this alleged error substantially prejudiced it. *See* Utah Code Ann. § 63G-4-403(4) (LexisNexis 2019). That is, Friends has not demonstrated that if the Executive Director had considered the Geertsen claim/evidence, it is reasonably likely that she would have held that the Director clearly erred in finding that the bedrock beneath Cell 1A was cemented and that there was, therefore, no hydraulic connection between the upper aquifer and potential lower aquifers. *See generally id.* § 19-1-301.5(14)(b), (16)(c)(ii); *Onysko v. Department of*

*Env't Quality*, 2020 UT App 51, ¶ 66, 463 P.3d 669, *cert. denied*, 466 P.3d 1072 (Utah 2020).

¶33    In support of her determination that the Director's finding was "adequately supported by the record," *see Salt Lake City Corp. v. Haik*, 2019 UT App 4, ¶ 43, 438 P.3d 913 (quotation simplified), *aff'd*, 2020 UT 29, 466 P.3d 178, the ALJ provided ten pages of analysis discussing the record evidence. The ALJ pointed to the Director's statement that, based on the boring logs presented in the Loughlin study, "[t]he upgradient and downgradient wells appear to monitor the same hydrologic unit (fanglomerate)" and "it is unlikely that there is flow from the alluvium into the bedrock." The ALJ also noted the Director's conclusion that "no site specific evidence has been presented supporting the commenters' concerns that there may be faulting in the bedrock beneath the landfill" and that, to the contrary, "evidence from core samples obtained during construction of the production well indicates fractures are cemented."

¶34    The ALJ also pointed to, among other things, Loughlin's responses to the Division's questions as evidentiary support for the Director's findings. Notably, when asked by the Director what impact "the Geertsen Canyon Quartzite, Browns Hole Formation, and Mutual Formation"—which the Loughlin study described as "highly to intensely fractured/jointed"—"have on groundwater systems and flow," Loughlin offered the following explanations:

- "Descriptions of bedrock depicted . . . are observations of surface outcrops and intensely fractured rocks under subaerial conditions that do not reflect conditions of subsurface bedrock, as identified during the drilling of the PPR Production Well."

- "Based on data from the PPR Production Well, '(1) the bedrock is dry to at least 730 feet, (2) the aquifer developed by the well is confined, and (3) the bedrock aquifer

gradient is upward and because the gradient is upward from the much deeper bedrock aquifer, the shallow fanglomerate aquifer identified in the vicinity of the landfill does not intermingle or flow to the deeper bedrock aquifer.'"

- "Drilling and groundwater sampling results from the PPR Production Well indicate (1) the quartzite bedrock penetrated by the PPR Production Well is relatively unfractured, and that the fractures that are present have been filled by gypsum and clay, (2) this formation is of extremely low permeability,[17] and (3) the gradient from the bedrock is upward because the aquifer is under confined conditions."

- "The landfill and the aquifer beneath the landfill are within an unfractured, low permeability fanglomerate deposit. No bedrock was intercepted beneath the landfill."

- "Although bedrock is intensely fractured where exposed at the ground surface, bedrock in the PPR Production Well was dense and hard and relatively unfractured. Where fractures were encountered in the PPR Production Well, they appeared to be filled with clay or mineralization."

¶35 The ALJ also pointed to Loughlin's responses to the Division's questions concerning the AGEC and Tetra Tech studies. The ALJ noted that "the Loughlin Study disagrees with the [Tetra Tech] and AGEC[] studies['] observations and conclusions, stating," among other things, that Tetra Tech and

---

17. The Loughlin study concluded that the fanglomerate formation "has very low permeability, as would be expected in a formation that contains an abundance of silt and clayey materials," based on slug tests it performed for the four new monitoring wells.

AGEC "did not use drilling equipment sufficient to drill through bedrock in test pits or monitoring wells (except [monitoring well 5]) and that statements that the bedrock was highly fractured are inaccurate" based on Loughlin's core samples. Instead, Loughlin suggested that "[t]he fanglomerate deposit may have been identified in previous site investigations as 'weathered bedrock.'"

¶36 In addressing Friends' challenges to the Director's findings, the ALJ stated that "[a]lthough Friends marshaled and acknowledged some of the evidence, it failed to marshal and acknowledge all of the evidence in the record that supports the Director's determination." For example, the ALJ noted that Friends did "not marshal evidence in the Loughlin Study on slug tests, aquifer parameters or upward gradient of the bedrock aquifer, supporting the Director's determination that there is no hydraulic connection between the shallow aquifer and the bedrock." The ALJ further stated that even without this marshaling deficiency, "Friends raises issues and makes speculative and general statements, but does not offer persuasive, specific evidence of a hydraulic connection between the shallow [fanglomerate] aquifer and the bedrock."

¶37 In light of the record evidence discussed by the ALJ,[18] Friends has not carried its burden to show that the evidence implicated by the Geertsen claim would have rendered the Director's finding "not adequately supported by the record," *see Haik*, 2019 UT App 4, ¶ 43 (quotation simplified), especially after

---

18. We do not include a complete discussion of the record evidence considered by the ALJ. The sample we outline is more than sufficient to show adequate support for the Director's finding even if the Executive Director had considered the Geertsen claim/evidence during her review. Accordingly, no prejudice to Friends flowed from the ALJ's decision that the Geertsen claim was not timely presented for her review.

having "resolv[ed] all disputes in the evidence"—including any inconsistencies between the Loughlin Study and the AGEC and Tetra Tech studies—"in a light most favorable to the [agency's] determination,"[19] *see id.* (quotation simplified). Notably, Friends

_____

19. In its opening brief, Friends attached, as Addendum I, eleven pages of argument, including a marshaling of evidence, it submitted to the ALJ on the issue of hydraulic connection. Friends incorporated by reference Addendum I into its opening brief and asserted, in relevant part, that Addendum I establishes that "based on the record evidence, the only defensible determination the Director could have made was that the aquifer was hydraulically connected to the fractured bedrock beneath it, and that because he failed to reach that determination, his decision was clearly erroneous." PPR moved to strike Addendum I, arguing that Friends was circumventing the page limit established by rule 24 of the Utah Rules of Appellate Procedure. We need not resolve this motion because, even considering the argument presented in Addendum I, Friends still has not carried its burden of persuasion for two reasons.

First, as the ALJ noted, Friends' argument presented in Addendum I "failed to marshal and acknowledge all of the evidence in the record that supports the Director's determination." Second, "To succeed on appeal, [a petitioner] must take issue with and demonstrate error in a *final* agency action[.]" *Utah Physicians for a Healthy Env't v. Executive Dir. of the Utah Dep't of Env't Quality*, 2016 UT 49, ¶ 17, 391 P.3d 148 (emphasis in original). In other words, a petitioner "must actually address the alleged errors in the Executive Director's final order in [its] opening brief." *Id.* ¶ 18. Addendum I challenged the Director's approval of the permit modification and not the Executive Director's final order. Accordingly, Addendum I is not sufficient to carry Friends' burden of persuasion because it does not address the entire evidentiary picture discussed by the ALJ and adopted by the Executive Director in her final order.

does not explain how the Geertsen claim interacts with Loughlin's response to the Division's question concerning the Geertsen Canyon Quartzite, the Browns Hole Formation, and the Mutual Formation.

¶38   Without focused analysis of this question, we cannot conclude that any error on the Executive Director's part substantially prejudiced Friends. *See* Utah R. App. P. 24(a)(8). Accordingly, Friends' argument is necessarily unavailing.

CONCLUSION

¶39   Friends has not demonstrated that either of the alleged errors committed by the Executive Director resulted in substantial prejudice. Accordingly, we decline to set aside the Executive Director's final order.[20]

------------

20. PPR requests an award of attorney fees it incurred in resisting Friends' petition for review, pursuant to rule 33 of the Utah Rules of Appellate Procedure. The imposition of attorney fees as a sanction for a frivolous appeal under rule 33 "is a serious matter and only to be used in egregious cases, lest the threat of such sanctions should chill litigants' rights to appeal lower court decisions." *Redd v. Hill*, 2013 UT 35, ¶ 28, 304 P.3d 861. Accordingly, sanctions are only "appropriate for appeals obviously without merit, with no reasonable likelihood of success, and which result in the delay of a proper judgment." *Id.* (quotation simplified). While unsuccessful, Friends' petition for judicial review was far from frivolous, and we deny PPR's request for attorney fees.